**Ricardo H. ROBINSON,
Petitioner–Appellant,**

v.

**Robert Glen BORG, Warden, et al.,
Respondent–Appellee.**

No. 89–55126.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 1, 1989.

Decided Oct. 30, 1990.

As Amended Dec. 11, 1990.

---

See also 156 Cal.App.3d 760, 203 Cal. Rptr. 6.

Shauna Weeks (law student), William J. Genego, Charles D. Weisselberg, Post Conviction Justice Project, University of Southern California Law Center, Los Angeles, Cal., for petitioner-appellant.

Donald E. De Nicola, Supervising Deputy Atty. Gen., Los Angeles, Cal., for respondent-appellee.

Before NORRIS, REINHARDT and TROTT, Circuit Judges.

REINHARDT, Circuit Judge:

Appellant Ricardo H. Robinson appeals the district court's denial of his petition for writ of habeas corpus. He maintains that the state trial court improperly admitted incriminating statements he made to police during custodial interrogation, in violation of his rights under the fifth and fourteenth amendments. Robinson asserts two independent grounds for relief. First, he claims that he did not make a knowing and intelligent waiver of his right to counsel during interrogation because he did not understand that he had a right to appointed counsel. Second, he contends that, prior to making the inculpatory statements admitted at trial, he unequivocally invoked his right to counsel. We agree with Robinson that his statement "I have to get me a good lawyer, man. Can I make a phone call?" constituted an unequivocal request for counsel, requiring that the interrogation cease. Accordingly, we reverse the district court's denial of Robinson's petition for habeas corpus relief.[1]

## I. FACTS

Following a jury trial, Ricardo Robinson was convicted of first-degree (felony) murder, mayhem, assault with a caustic substance, and conspiracy to commit mayhem. Part of the evidence introduced against Robinson at trial consisted of incriminating statements he made to police during custodial interrogation. Robinson sought to suppress these statements prior to trial, arguing that he had not knowingly and intelligently waived his right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that the police did not honor his subsequent request for counsel. Following a hearing, at which a tape and transcript of the interrogation were introduced, the state trial court denied Robinson's motion to suppress. The statements were then admitted into evidence at his trial.

The suppression hearing reveals that the police advised Robinson of his *Miranda* rights before beginning questioning. The parties agree that the *Miranda* warnings given were correct on their face. When asked if he wished to give up his right to remain silent, Robinson stated, "No. I mean ... No, I'll speak now and answer questions without an attorney." In response to a series of questions designed to clarify whether he wished to give up his right to an attorney at questioning, Robinson replied, "If I say yes, I'd want an attorney then I'd have to get one here, is that right? (Unintelligible) Yeah, I give it up." Police then proceeded to interrogate Robinson for approximately four and one-half hours.

At one point during the interrogation, Robinson said, "Maybe I shoulda got an attorney." After further questioning, he asked, "Man ... can I make a phone call?" The detective questioning Robinson ignored this request, stating, "Hey, I was going to play a ... portion of a tape for you in a second; I want you to listen to it, O.K.?" After more questioning, Robinson again asked to make a phone call, this time, however, making it clear that he wished to obtain counsel. He stated, "I have to get me a good lawyer, man. Can I make a phone call?"[2] One of the interrogators

---

**1.** Robinson argued, in the alternative, that his statement was an equivocal request for counsel and that, pursuant to our decision in *United States v. Fouche*, 776 F.2d 1398 (9th Cir.1985), police were required to discontinue interrogation except for questions designed to clarify his request. Appellee countered that the holding in *Fouche* should not be applied retroactively to this case. Because we conclude that Robinson's statement constituted an unequivocal rather than an equivocal request for counsel, we need

not reach that issue. Similarly, although Robinson's contention that his waiver was not knowing and intelligent is one of serious concern, our holding that Robinson unequivocally asserted his right to counsel prior to making the inculpatory statements at issue will require suppression of those statements, and it is, therefore, unnecessary for us to reach his waiver contention.

**2.** On appeal, the State argues that Robinson's real words were: "I think you'd make a good

responded by saying "sure," and then asking Robinson if he wished to call another suspect (and future co-defendant) in the case. When Robinson immediately replied "No" the interrogator resumed questioning him. Questioning continued until Robinson asked to call his mother, at which time the interrogators agreed to let him make that call. When Robinson returned from telephoning, the detectives resumed the interrogation. They then questioned him at great length concerning his knowledge of and participation in the crime under investigation. It was during this part of the interrogation that Robinson made the incriminating statements that were the subject of his pretrial motion to suppress.

Following his conviction, Robinson appealed to the California Court of Appeals. The court of appeals affirmed, ruling that the trial court's denial of the motion to suppress was amply supported by the record. The California Supreme Court denied Robinson's petition for review.

After two unsuccessful state habeas petitions, Robinson filed his federal habeas petition. The district court, adopting the Magistrate's Report and Recommendation without modification, denied the petition. The court concluded that Robinson had knowingly and intelligently waived his right to counsel prior to the time the questioning began. The court also found that Robinson did not make an unequivocal request for counsel during the interrogation. Lastly, the court noted that, even if Robinson's statement were interpreted as an equivocal request for counsel, this court's decision in *Fouche* should not be applied retroactively to this case.[3]

## II. STANDARD OF REVIEW

■■■ The state court's determination of what is said during an interrogation constitutes a factual finding entitled to a pre-

lawyer, man. Can I make a phone call?" The state trial court apparently, and the federal magistrate explicitly, found that Robinson stated, "I have to get me a good lawyer, man. Can I make a phone call?" After reviewing the tape of the interrogation, we have no doubt that the state court's and the magistrate's findings are correct.

sumption of correctness under 28 U.S.C. § 2254(d). *See McKenzie v. Risley*, 842 F.2d 1525, 1531 (9th Cir.) (en banc), *cert. denied sub nom. McKenzie v. McCormick*, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988). Whether the suspect's words constitute a request for counsel is a legal determination which we review *de novo*. *Smith v. Endell*, 860 F.2d 1528, 1532 n. 3 (9th Cir.1988) ("[T]he state court's characterization of Smith's words is hardly a finding of fact.... The constitutional effect of the dialogue is a legal question subject to our independent review.").

## III. DISCUSSION

■■ Under *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), if at any point during an interrogation a suspect invokes his right to counsel, all questioning must cease and may not resume in the absence of counsel unless the suspect himself initiates the further discussions. *See also Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488 (1984) (per curiam) ("[I]f the accused invoked his right to counsel, courts may admit his responses only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."). Once a suspect has requested the presence of an attorney, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484, 101 S.Ct. at 1885. The Supreme Court has stated that *Edwards* establishes a " 'rigid' prophylactic rule." *Smith v. Illinois*, 469 U.S. at 95, 105 S.Ct. at 492–93 (citing *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 2568–69, 61 L.Ed.2d 197 (1979)).

3. As noted above, we will not address whether Robinson's waiver was valid or whether *Fouche* would be applied retroactively, as resolution of these issues is not necessary to the disposition of this case.

At issue here is whether Robinson invoked his right to counsel when he said, "I have to get me a good lawyer, man. Can I make a phone call?" Requests for counsel are to be given broad effect even when less than all-inclusive. *Connecticut v. Barrett,* 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987). "Doubts must be resolved in favor of protecting the constitutional claim." *Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631 (1986); *see also Smith v. Endell,* 860 F.2d 1528, 1531 n. 2 (9th Cir.1988); *Grooms v. Keeney,* 826 F.2d 883, 886 (9th Cir.1987); *Owen v. Alabama,* 849 F.2d 536, 538–39 (11th Cir.1988); *United States v. Gotay,* 844 F.2d 971 (2nd Cir.1988). Moreover, a suspect's "*postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois,* 469 U.S. at 100, 105 S.Ct. at 495 (emphasis in original). Nevertheless, the Supreme Court has recognized that "[o]n occasion, an accused's asserted request for counsel may be ambiguous or equivocal." *Id.* at 95, 105 S.Ct. at 493.

Robinson argues that his statement that he had to get a good lawyer followed immediately by his request to make a phone call constituted an unambiguous and unequivocal invocation of his fifth amendment right to counsel. We agree. While the word "attorney" has no talismanic qualities, *see United States v. Jardina,* 747 F.2d 945, 949 (5th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 833 (1985), Robinson made clear his perceived need for a lawyer and his desire to obtain the assistance of counsel. No more is required. Upon hearing Robinson's request it was incumbent upon the police to cease the interrogation, and their failure to do so renders inadmissible any statements he made in response to their continued questioning. *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85.

The State contends that Robinson's statement was not a request for counsel because he was not attempting to invoke a present right to counsel. Rather, according to the State, Robinson's remark reflected his recognition that he faced a difficult criminal trial ahead. We do not believe that as a matter of either logic or semantics Robinson's statement is reasonably susceptible to such an interpretation. Nor do our cases permit such a construction.

In analyzing a defendant's request for counsel, we take a defendant's words "understood as ordinary people would understand them." *Connecticut v. Barrett,* 479 U.S. at 529, 107 S.Ct. at 832. Robinson's statement "I have to get me a good lawyer, man. Can I make a phone call?", made in the middle of an interrogation, can only reasonably be understood as expressing a desire to obtain counsel and to do so immediately, not at a trial several months later. Robinson's request to make a phone call immediately after stating that he had to get a good lawyer was a request to make a call at that moment, and the interrogators so understood it. The purpose of the call was obvious; Robinson wanted to obtain a lawyer—and he wanted one in connection with the interrogation he was then undergoing. If Robinson had only wanted an attorney for a trial to be held several months later, he could well have waited until after the end of the interrogation to make his call. The only reasonable explanation for Robinson's decision to interrupt the questioning and ask to make the call was that he wanted an attorney in connection with the interrogation.[4]

---

4. In arguing that Robinson was not invoking a present right to counsel, the dissent and the State ask us to look at the "fuller context of the entire interrogation." The magistrate, in agreeing with the State, relied on a statement by the California Superior Court judge that, "there was an alluding to an attorney on a couple of occasions ... but again, *basing my feelings on the totality of the circumstances prior to and subsequent to,* there was never really an asking by Mr. Robinson for an attorney." (emphasis added). The dissent also relies heavily on Robinson's post-request responses. The dissent and the State, as well as the magistrate and the state court, err by looking at the "totality of the circumstances," particularly the events subsequent to Robinson's request, to determine whether he adequately invoked his right to counsel. The Supreme Court in *Smith v. Illinois* emphasized that an accused's postrequest responses cannot be used to cast doubt on the

■ Robinson was not required to state his request with any more temporal particularity. In rejecting a similar contention that defendants did not intend their request for counsel to encompass representation during police questioning (as opposed to formal legal proceedings), the Supreme Court in *Michigan v. Jackson*, 475 U.S. at 633 n. 7, 106 S.Ct. at 1409–10 n. 7, stated:

> Although judges and lawyers may understand and appreciate the subtle distinctions between the Fifth and Sixth Amendment rights to counsel, the average person does not. When an accused requests an attorney ... he does not know which constitutional right he is invoking; he therefore should not be expected to articulate exactly why or for what purposes he is seeking counsel.... The simple fact that defendant has requested an attorney indicates that he does not believe that he is sufficiently capable of dealing with his adversaries singlehandedly.

The Court has therefore not required that a suspect specify that he wants an attorney at questioning in order to invoke a "present" right to counsel. In *Oregon v. Bradshaw*, 462 U.S. 1039, 1041–42, 103 S.Ct. 2830, 2832–33, 77 L.Ed.2d 405 (1983) (plurality opinion), for example, the Court considered defendant's statement "I do want an attorney before it goes very much further" to constitute a present invocation of that right. Similarly, in *Edwards v. Arizona*, 451 U.S. at 479, 101 S.Ct. at 1882, the Court held that the statement "I want an attorney before making a deal" was a request for counsel that precluded any further questioning, even though no "deal" was ever made. *See United States v. Gotay*, 844 F.2d 971, 976 (2nd Cir.1988) (noting that "the Supreme Court has been notably generous in construing the temporal aspects of requests for counsel"). Robinson's statement was sufficient to invoke his right to counsel effective immediately. There is no requirement that a suspect specify that he wants counsel at the questioning. Robinson was not required to make a temporal statement—to say that he wanted counsel right away—and his failure to do so does not render his invocation of his right less than immediate.

■ Nor do we find Robinson's request for counsel to be ambiguous or equivocal in any other respect. As noted, Robinson made his desire to obtain an attorney clear. That his statement was a sufficient invocation of his right to counsel is supported by a number of cases that have found similar or less direct requests to be unequivocal. In *Smith v. Illinois*, 469 U.S. at 96, 105 S.Ct. at 493, the Supreme Court held that a suspect had made an unequivocal request for an attorney when, upon learning that he had the right to the presence of counsel, he stated, "Uh, yeah, I'd like to do that." Recently, in *Shedelbower v. Estelle*, 885 F.2d 570, 573 (9th Cir.1989), we treated defendant's statement "You know, I'm scared now. I think I should call an attorney." as an invocation of his right to counsel. The defendant in *Smith v. Endell*, 860 F.2d 1528, 1531 (9th Cir.1988), had asked police, "Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?" We held that this request was conditional, but was not equivocal or ambiguous. And in *United States v. Nordling*, 804 F.2d 1466, 1471–72 (9th Cir.1986), we found that defendant's statement that his interrogators could call his attorney to identify him and that he wanted to speak with his lawyer when they did was a sufficient assertion of his right to counsel. *See also Owen v. Alabama*, 849 F.2d at 538–39 (defendant's response to *Miranda* warning concerning right to counsel, "I think I'll let y'all appoint me one," was arguably a clear invocation of right to counsel which should be interpreted broadly); *United States v. Gotay*, 844 F.2d at 976 (accused's statement that she could not afford a lawyer and was

---

clarity of the initial request, 469 U.S. at 100, 105 S.Ct. at 495, and "[t]he totality of the circumstances test, which is used to determine whether an accused has 'knowingly and voluntarily' waived his *Miranda* rights, has no role in the

determination of whether an accused's request for counsel is clear or equivocal." *Owen v. Alabama*, 849 F.2d at 539 (citation omitted); *cf. Smith v. Illinois*, 469 U.S. at 97–98, 105 S.Ct. at 493–94.

concerned about obtaining a lawyer was arguably a clear request for counsel, requiring that questioning cease); *White v. Finkbeiner*, 611 F.2d 186, 190 (7th Cir. 1979) (defendant's statement "I'd rather see an attorney" when asked if he wanted to talk constituted a request for counsel); *United States v. Clark*, 499 F.2d 802, 806 (4th Cir.1974) (suspect's remark "I had better talk to a lawyer" considered a request for a lawyer). As these cases illustrate, a suspect is required neither to use any magical formulation to invoke his rights nor to express his desire to obtain counsel with lawyer-like precision. All that is required is that he make his desire to consult with an attorney clear. Robinson's statement satisfies that requirement.

Our conclusion that Robinson's invocation of his right was clear is strengthened by a comparison with cases in which a defendant's request has been held to be ambiguous or equivocal. In *United States v. Fouche*, 776 F.2d 1398 (9th Cir.1985), we first had occasion to consider what constitutes an effective assertion of the right to counsel. We held that defendant's statement that he "might want to talk to a lawyer" and wanted to make a phone call was an equivocal request for counsel, requiring that any further questioning be limited to clarifying the defendant's request. *Fouche*, 776 F.2d at 1405. On appeal after remand, we emphasized the ambivalent or uncertain nature of Fouche's request, noting:

> in some circumstances ... the request for counsel may be equivocal or ambiguous, as when Fouche said that he *might* want to talk to a lawyer or *might* want to talk to the FBI agents.

*United States v. Fouche*, 833 F.2d 1284, 1287 (9th Cir.1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988) (emphasis in original). Our other cases have been similar. In *Grooms v. Keeney*, 826 F.2d 883, 886–87 (9th Cir.1987), we found that the defendant's request for

counsel was ambiguous or equivocal when he answered "I don't know" in response to the question whether he wished to consult with an attorney. More recently, in *Robtoy v. Kincheloe*, 871 F.2d 1478, 1482 (9th Cir.1989), *cert. denied sub nom., Robtoy v. Callahan*, ── U.S. ──, 110 S.Ct. 1483, 108 L.Ed.2d 619 (1990), we treated defendant's remark "maybe I should call my attorney" as an equivocal request for counsel. *Accord United States v. Cherry*, 733 F.2d 1124, 1130 (5th Cir.1984) (holding that defendant's request for counsel was equivocal when he stated "maybe I should talk to an attorney before making a further statement," followed by, "why should I not get an attorney?"). Finally, in distinguishing the defendant's statement in *Smith v. Endell*, 860 F.2d at 1531, from an ambiguous or equivocal response, we noted, "[Smith's] statement was not equivocal; there was no 'might' or 'maybe' or 'perhaps.'"

Robinson's statement "I have to get me a good lawyer, man. Can I make a phone call?" lacks the uncertainty and indecisiveness that is necessary to warrant classifying a statement as ambiguous or equivocal. Robinson made his perceived need for a lawyer, as well as his desire to make a phone call to obtain one, clear, and his statement evinces no doubt or indecisiveness as to whether he should seek an attorney's aid. "[T]here was no 'might' or 'maybe' or 'perhaps.'" *Id.* Robinson's statement was an unambiguous and unequivocal request for counsel, requiring that all interrogation cease immediately. The statements he made in response to continued questioning after that request must be suppressed.[5]

▮▮ Accordingly, we reverse the district court's denial of Robinson's habeas corpus petition and remand for proceedings not inconsistent with this opinion.[6]

REVERSED AND REMANDED.

---

5. The State does not contend that the failure to suppress Robinson's statements is harmless error. *See Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967).

6. The unfortunate comments regarding *Miranda* with which our colleague introduces his dissent require a brief response. As was true in *Miranda* itself, where the defendant was ultimately retried and convicted, *see State v. Miranda*, 104

# 1394

TROTT, Circuit Judge, dissenting:

In some unknown number of cases the Court's rule will return a killer, a rapist or other criminal to the streets and to the environment which produced him, to repeat his crime whenever it pleases him. As a consequence, there will not be a gain, but a loss, in human dignity.... There is, of course, a saving factor: the next victims are uncertain, unnamed and unrepresented in this case.

*Miranda v. Arizona,* 384 U.S. 436, 542–43, 86 S.Ct. 1602, 1663, 16 L.Ed.2d 694 (1966) (White, J., dissenting).

Today, these poignant and prophetic words lose their abstract quality as the prison doors that closed behind Ricardo H. Robinson in 1982 are unlocked. But my quarrel here is not with *Miranda* itself; it is with the manner in which *Miranda* and its progeny are applied by my respected colleagues to the facts and legal circumstances of this case. In that connection, this case as I see it is mostly about the prophylactic rules and remedies *designed by the judiciary* "to promote sensitivity to constitutional values through [their] deterrent effect." [1] *Duckworth v. Eagan,* —— U.S. ——, 109 S.Ct. 2875, 2882, 106 L.Ed.2d 166 (1989). (O'Connor, J., concurring). Thus, it is appropriate in my view for the judiciary to be mindful of Justice White's concerns and to monitor carefully the costs of these rules as they are applied to the cases that come before us. Lest we lose sight of these costs, I begin with a description of Robinson's unspeakable conduct, for which a California jury found him guilty of murder with the special circumstances of torture and murder for financial gain, mayhem, assault with a caustic substance, and conspiracy to commit the above.

In 1980, Robinson's codefendant Gilman (a law school graduate) fell out with his fiancee, Patricia Worrell (a law student). Later that year, Gilman decided on revenge. He located a "hit man," Bobby Savage, through a prostitute in Las Vegas. Savage, a pimp and a bounty hunter for a bail-bondsman, was paid $750 to "beat up" Ms. Worrell. Savage stalked Ms. Worrell in Los Angeles, but eventually returned to Las Vegas without earning his fee. Shortly thereafter, Savage telephoned Gilman and put Robinson (a drug dealer) on the line. "Robinson demanded an extra $1,000 for the job. Gilman eventually agreed to the increase in money and told Robinson he wanted them to throw lye or acid on Ms. Worrell. Gilman also told Savage and Robinson to rough Gilman up too, to make it 'look good.'" *People v. Gilman and Robinson,* 156 Cal.App.3d 760, 763, 203 Cal. Rptr. 6 (1984).

On August 14, 1980, Robinson and Savage knocked on Ms. Worrell's door. When

---

Ariz. 174, 450 P.2d 364, *cert. denied,* 396 U.S. 868, 90 S.Ct. 140, 24 L.Ed.2d 122 (1969), our opinion does not foreclose the possibility of a new trial. It does not require that Robinson be returned to the streets or that any prison doors be unlocked. The state is free to try him again. To represent to the public that California will release him pending a new trial is disingenuous at best. Today, unremarkably, we hold only that a conviction obtained in violation of the fifth amendment cannot stand. We are required by well-established precedent and the Constitution to reach that result. Despite the dissent's attempt to denigrate *Miranda* and its progeny to the status of *mere* prophylactic rules unworthy of real implementation, the precedents we apply here are of constitutional magnitude and as binding as any other decisions of the United States Supreme Court.

Judge Trott may believe that *Miranda* was wrongly decided. It was, after all, a controversial decision in 1966. Since then, however, it has become settled law upon which defendants and law enforcement officials alike have come to rely. A citation to the *Miranda* dissent today, therefore, carries as much weight as would a citation to the dissent in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) or to Justice Butler's opinion disagreeing with the rule announced in *Erie R.R. v. Tompkins,* 304 U.S. 64, 80, 58 S.Ct. 817, 823, 82 L.Ed. 1188 (1938). Those Supreme Court decisions were also controversial in their day, but like *Miranda,* have since been fully accepted by those in the constitutional mainstream.

1. The majority points out that their opinion does not "foreclose the possibility of a new trial." Majority opinion at 1394. This may come as little solace to Patricia Worrell's family, to those responsible for reassembling for retrial the components of a stale case now ten years old, to those who relied on the admissibility of Robinson's confession in structuring the evidence-gathering aspect of the investigation of this case, and to those who believe that a system of "justice" must strive to bring litigation to an appropriate conclusion in less than a decade.

she responded, Savage threw lye in her face. Gilman, who was in the house at the time, drove a crying and screaming Ms. Worrell—and her son—to the hospital.

"Ms. Worrell's upper body and face were severely disfigured by the lye. She was blinded in her left eye. Some of the lye entered her mouth, burned through her esophagus and eventually burned through a [major] artery. This eventually caused a massive hemorrhage that caused her death on August 24, 1980." *Id.* at 764, 203 Cal. Rptr. 6.

Robinson was arrested for these crimes, and he confessed to his role in assaulting and killing Ms. Worrell.

## I

My analysis of the *Miranda* issues in this case begins with the pre-interrogation advisement of rights Detective True administered to Robinson. The advisement was thorough, and its thoroughness reveals that the two detectives scrupulously respected the instructions of the Supreme Court. Detective True and his partner Officer Guarino focused directly on Robinson's right to have "an attorney present during our questioning right now" and did not leave the subject until it was clear to them that Robinson understood and chose to answer questions voluntarily.

The exact colloquy was as follows:

Detective True: All right, before we start the interview, we wanna advise you of your rights ...

Petitioner: O.K.

Detective True: ... constitutional rights, O.K.? You have the right to remain silent. If you give up the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to speak with an attorney and to have an attorney present during questioning. If you so desire and cannot afford one, an attorney will be appointed for you without charge before questioning. O.K.? Do you understand each of these rights that I've explained to you?

Petitioner: Yeah.

Detective True: Do you wish to give up the right to remain silent?

Petitioner: No. I mean ... No, *I'll speak now and I'll answer questions without an attorney.*

Detective True: O.K. So you do wish to give up the right to remain silent?

Petitioner: Yeah.

Detective True: And talk to me?

Petitioner: Right.

Detective True: O.K. Do you wish to give up that right to speak to an attorney and to have him present during questioning?

Petitioner: This questioning right ... right here, right now? No, *I don't see why not, you know* ... (unintelligible).

Officer Guarino: What do you mean? You don't, you don't want, you don't need an attorney here now, right now, while we talk?

Petitioner: I mean for ... I was, *see I ain't did nothin'. I can answer everything you want me to.*

Officer Guarino: Well, this is why we wanta understand.

Detective True: This, this is what I'm asking you. Do you give up the right to have an attorney present during our questioning right now.

Petitioner: If I say yea, I'd want an attorney then I'd have to get one here, is that right? (Unintelligible) *Yeah. I give it up yeah, yeah.*

Detective True: O.K. . . . . .

Transcript of Interrogation of Petitioner–Appellant Ricardo H. Robinson (emphasis added).

The Supreme Court's purpose in *Miranda* was to affect police conduct during interrogations and to promote sensitivity to constitutional values. This case, along with thousands of others, provides proof it has succeeded. Moreover, the police here, by tape recording this interview, willingly exposed their behavior to close scrutiny. This is inconsistent with conduct designed to subvert Robinson's rights. Neither does it show an intent to engage in coercive or improper behavior. The discourse is all there, on tape and in print, to listen to, to study, and to dissect.

## II

Robinson's attorney claims Robinson's waiver was defective because the *Miranda* colloquy indicates that Robinson believed he was responsible for obtaining an attorney himself, whether he could afford it or not. Robinson has never so testified, and I am not persuaded that this strained attempt to read meaning into the exchange has merit. True told Robinson he could have an attorney "without charge before questioning," and Robinson's answer was clear: "I'll speak now and I'll answer questions without an attorney." Under the "totality of the circumstances surrounding the interrogation" test, *see Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986), I find a clear waiver.

## III

The finding of an express waiver sheds considerable light not only on Robinson's original decision to talk, but also on (1) the meaning of Robinson's references to an attorney in the questioning that followed, references on which the majority opinion focuses in reversing the district court, and (2) what the police should have done when confronted with the references. The majority opinion finds these references to constitute an unequivocal invocation of the present right of counsel, requiring all questioning to cease at the moment the "invocation" occurred. I respectfully disagree with this analysis.

As I read the record, Robinson alluded to counsel on several occasions during questioning, but he *never* expressed either (1) a clear change of heart vis-a-vis his earlier waiver, or (2) a decision to stop talking with the police until he got an attorney or, for that matter, to stop talking period. The statements "I have to get me a good lawyer man. Can I make a phone call?" *may* mean exactly that, but *in context* they require interpretation; this is the essence of ambiguity. Had these statements been made during the *initial* advisement, their meaning would no doubt have been different and—because of context and juxtaposition—might have constituted an unequivocal request for an attorney. *These* statements, however, were made in the midst of a continuing conversation *preceded by a waiver and an express willingness to talk.* I see them as calling for interpretation or clarification.

When the person being questioned has already expressly declined to secure the services of an attorney and is talking freely to the police, the logical response would be to follow-up on such statements with clarifying questions, such as, "Does that mean you don't want to talk to us anymore until you get an attorney?"[2] Ordinary people, including ordinary police officers, *see Connecticut v. Barrett,* 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987), would understand Robinson's words not as a clear invocation of a present right to an attorney, but as an ambiguous reference to an attorney that required clarification. What Robinson said does not necessarily mean he had changed his mind about talking to the police.

But another crucial aspect of Robinson's compound statement about an attorney and a phone call weighs heavily on what he meant, and whether it was ambiguous. Immediately following the statement, the police asked questions about who he wanted to call. His ultimate answer? "I want to call Mom; that's my mother." The exchange was as follows:

Robinson: I have to get me a good lawyer, man. Can I make a phone call?

Ferrand: *Sure. We'll let you make a phone call* ... local? Hey, you wanta call Mr. Monday?

Robinson: No.

Ferrand: Do you know where ... he is located?

Robinson: I wish I did.

Ferrand: *I know where he's located. I know where this guy is located, too.*

Guarino: It's just a matter of time. It's just a matter of going there and

---

2. For this case, the most appropriate example of "clarifying questions" is found in True's advisement of Robinson quoted earlier. Why a procedure that is commendable at the beginning of questioning becomes something we condemn if it is appropriate later escapes me.

gettin' 'em. You have a good opportunity....

Robinson: .... I guess these two guys have track records, or sumpin', huh?

Guarino: .... to give us your (unintelligible). Hey ... well, we're givin' you the opportunity to give us your side of the story right now, uh ...

Robinson: I understand that.

Guarino: .... You're, uh ... I, I don't think we could be any more ...

Ferrand: *You wanta call your uncle?*

Robinson: *I wanta call Mom; that's my mother, man.*

Guarino: Where's she, Pittsburgh?

Robinson: Yeah, Pennsylvania. (Unintelligible)

Guarino: Well, we can't ...

Robinson: Can't do that, huh?

Ferrand: That's kinda far ...

Guarino: Rick, we can't, we can't ...

Robinson: I'll call collect.

Guarino: ... Pittsburgh (unintelligible)

Robinson: I'll call collect. (Unintelligible).

Ferrand: You can call collect?

Robinson: I can call collect.

Guarino: Well, if you can, you can call.

Ferrand: Rick, tell her that you've been used ... set up, set up by two paddies and that you don't have enough sense ...

Transcript of Interrogation of Petitioner–Appellant Richard H. Robinson (emphasis added).

Even though the police used a name and a relationship—"Mr. Monday" and "your uncle"—in asking Robinson who he wanted to call, their questions were no different than saying, "sure you can make a phone call, who do you want to call?" The police did not drop the subject brought up by Robinson. The transcript reveals that Officer Ferrand kept it alive, and he was within constitutional bounds in so doing. Under such circumstances, the law permits the police to ask questions devised to clarify the request[3] as well as to respond naturally to the request in a manner reasonably calculated to enable the request to be effectuated. Such questions hardly amount to interrogation, much less interrogation designed to produce incriminating evidence. *See Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The police are not required by the Constitution when a suspect asks to make a phone call—even to an attorney—to clam up and escort the suspect to his cell without uttering another syllable. The only activity guarded against is further *interrogation.* Robinson's answer to Ferrand's inquiry—"my mother, man"—renders the complete exchange clearly ambiguous as to whether he was requesting the presence of an attorney. The judgment we are required to make on this issue cannot be an informed one unless we look at the *entire* exchange. Contrary to the majority's claim, *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) does not prohibit this approach. *Smith* was concerned with an accused's "post request responses to *further interrogation.*" 469 U.S. at 100, 105 S.Ct. at 495 (emphasis added). Officer Ferrand's question, "[y]ou want to call your uncle?", was not "further interrogation"—it was merely a natural response to Robinson's request to make a phone call. As such, it was not a "post request response to interrogation" but an integral part of the exchange on the subject of the phone call. Thus, Ferrand's question and Robinson's answer may be looked at in deciding whether what he said was equivocal. And, in fact, the proof of the pudding was in the eating: The phone call he made—within minutes of the request and with the assistance of the police—was to his mother in Pennsylvania. After his discussion with her, he continued to talk willingly to the police, without making any references to an attorney.

The majority opinion comes to a screeching halt in its analysis with the word "lawyer," an incomplete approach that skews the inquiry, slights the law, and produces

---

**3.** *See United States v. Fouche,* 776 F.2d 1398, 1405 (9th Cir.1985); *United States v. Nordling,* 804 F.2d 1466, 1470 (9th Cir.1986); *Smith v. Endell,* 860 F.2d 1528, 1529 (9th Cir.1988).

an incorrect result. *Bruni v. Lewis*, 847 F.2d 561 (9th Cir.1988), teaches us that the word "attorney" has no talismanic qualities; the mere use of it by a suspect such as Robinson does not abruptly bring the curtain down on all further questioning. *See also United States v. Jardina*, 747 F.2d 945, 949 (5th Cir.), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 833 (1985). *Bruni* also held, *Edwards* notwithstanding, "a defendant may selectively waive his Miranda rights, deciding to respond to some questions but not to others." 847 F.2d at 564.[4] This reasoning is consistent with *Connecticut v. Barrett*, which permits police to question a suspect who says he will not make a written statement without a lawyer but will answer questions orally for the police. As the use of the word attorney did not bar further questioning in *Barrett* and *Bruni*, so it should not here either. Certainly it should not prohibit Officer Ferrand from asking Robinson if he wants to call his uncle. Thus, unlike my respected colleagues, I see Robinson's references to an attorney during the questioning as equivocal.[5]

## IV

This conclusion takes me down a different analytical road than the majority has taken. The next issue I must address is the effect of an *equivocal* request for counsel and the response required of interrogating police officers.

The leading case in this circuit on the subject of midquestioning equivocal references to an attorney is *United States v. Fouche*, 776 F.2d 1398 (9th Cir.1985) ("*Fouche I*").[6] *Fouche I* held that "where a suspect makes an *equivocal* assertion of [the right to] counsel, the police must cease all questioning, except that they may at-

tempt to clarify the suspect's desire for counsel." 776 F.2d at 1404 (emphasis added). Prior to *Fouche I*, *Edwards v. Arizona*, 451 U.S. 477, 101 .S.Ct. 1880, 68 L.Ed.2d 378 (1981), required police conducting a properly Mirandized interrogation to cease questioning when confronted by an unequivocal invocation of rights. It was not until *Fouche I*, however, that this circuit, following the Fifth Circuit in *United States v. Cherry*, 733 F.2d 1124, 1130–31 (5th Cir.1984), advised law enforcement of the proper procedure when confronted with post-waiver equivocation. Had Robinson's interrogation occurred after 1985, *Fouche I* would have controlled, but it did not. Thus, the question is whether *Fouche I* applies retroactively to Robinson. Based on the well-reasoned recommendation of the magistrate, the district court ruled that *Fouche I* did not apply retroactively.

*Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), states the test for retroactivity. In *Teague*, the Supreme Court held that "new rules" are not to be applied retroactively in collateral habeas corpus proceedings unless they decriminalize conduct or are necessary to ensure an accurate verdict—two exceptions that are not relevant to this case. How has the court defined a "new rule"? It has defined it as a holding that breaks new ground or imposes a new obligation on the states or the federal government. *Id.; see also, Penry v. Lynaugh*, 492 U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

This test was refined in *Butler v. McKellar*, —— U.S. ——, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), where the court, holding that *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), announced a "new rule," remarked that a decision announces a new rule " 'if the result was not *dictated* by precedent exist-

---

**4.** *Bruni responded to a Mirandized request that he answer questions by saying "not without my attorney." He then added, "well, ask your questions and I will answer those I see fit." Id.*

**5.** This conclusion is bolstered by the state court's factual findings. *See* 28 U.S.C. § 2254(d). The trial judge hearing the matter found the following: "[T]here was an alluding to an attorney on a couple of occasions ... but again, basing my feelings on the totality of cir-

cumstances prior to and subsequent to, there was never really an asking by Mr. Robinson for an attorney." Report and Recommendation of United States Magistrate Charles F. Eick, filed July 19, 1988.

**6.** *Fouche I* came before this court for a second time on appeal. *United States v. Fouche*, 833 F.2d 1284 (9th Cir.1987) ("*Fouche II*").

ing at the time the defendant's conviction became final.'" *Id.* at 1216 (emphasis in original) (citation omitted).

The court went on to point out:

[T]he fact that a court says that its decision is within the "logical compass" of an earlier decision, or indeed that it is "controlled" by a prior decision, is not conclusive for purposes of deciding whether the current decision is a "new rule" under *Teague.* Courts frequently view their decisions as being "controlled" or "governed" by prior opinions even when aware of reasonable contrary conclusions reached by other courts. In *Roberson* [*Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (if an in-custody suspect invokes the right to counsel as to one investigation, police are barred from interrogating as to a separate investigation)], for instance, the Court found *Edwards* controlling but acknowledged a significant difference of opinion on the part of several lower courts that had considered the question previously.

110 S.Ct. at 1217 (citation omitted).

I see *Fouche I* as creating a "new rule," and I do so for four reasons. First, the Supreme Court made it clear in *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), that the *Miranda* rules are not "themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected...." *Id.* at 444, 94 S.Ct. at 2364. *Tucker* also teaches that if the procedure or treatment complained of, measured by the historical circumstances underlying the privilege against compulsory self-incrimination, did

not deprive a petitioner of a constitutional right, then we are dealing with *"only the prophylactic rules* developed to protect that right." *Id.* at 439, 94 S.Ct. at 2361 (emphasis added). An examination of the record in the instant case demonstrates that what we face is not compulsory self-incrimination, but an alleged violation of the rules of engagement established by *Miranda* and its progeny. This is not to relegate the rules to insignificance, but the distinction between rights themselves, on the one hand, and "suggested safeguards ... not intended to 'create a constitutional straightjacket,'" on the other, *id.* at 444, 94 S.Ct. at 2364 (citation omitted), is one of considerable substance.

Constitutional rights are constant; prophylactic rules by comparison are less permanent and reflect the federal judiciary's judgment of what is necessary to protect those rights. Of course, these rules are important and must be respected,[7] but they are nonetheless transient rules as compared to constitutional rights.[8] *Tucker* demonstrates this difference. When the *Tucker* court concluded it was not facing an abridgement of a constitutional principle, it applied the *Miranda* rules less stringently.

Second, I see the *Fouche I* rule as "new" in this context because, when it was articulated in 1985, it addressed an area of *Miranda* for which this circuit had issued no definitive prescription. We noted in *Fouche I* that the Supreme Court has "not addressed what constitutes a valid assertion of the right to counsel," 776 F.2d at 1404, commenting that *Edwards* addresses only "a right to counsel that has been

---

7. *See Collazo v. Estelle,* 884 F.2d 1168, 1171 *en banc reh'g granted,* 898 F.2d 87 (9th Cir.1989) (Trott, J., dissenting) ("As long as [*Miranda* ] is the law of the land, it must be respected.").

8. This is exemplified by the comments of Justice Blackmun in his concurring opinion in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), albeit in a case involving the Fourth Amendment and the good-faith exception to the exclusionary rule:

What must be stressed, however, is that any empirical judgment about the effect of the exclusionary rule in a particular class of cases

necessarily is a provisional one. By their very nature, the assumptions on which we proceed today cannot be cast in stone. To the contrary, they will now be tested in the real world of state and federal law enforcement, and this court will attend to the results. If it should emerge from experience that, contrary to our expectations, the good faith exception to the exclusionary rule results in a material change in police compliance with the Fourth Amendment, we shall have to reconsider what we have undertaken here.

*Id.* at 928, 104 S.Ct. at 3423.

'specifically invoked.'" *Id.* Judge Tang also stated in *Fouche I:* "No Ninth Circuit cases provide guidance." *Id.* Indeed, in 1984 the Supreme Court explicitly declined to articulate a standard for determining whether equivocal statements constitute invocation of the right to counsel: "We do not decide the circumstances in which an accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself, nor do we decide the consequences of such ambiguity or equivocation." 469 U.S. at 99–100, 105 S.Ct. at 494–95. The court noted that "courts have developed conflicting standards for determining the consequences of such ambiguities." *Id.* at 96, 105 S.Ct. at 493.[9]

Third, I do not believe the rule established in *Fouche I* was "dictated" by precedent. It is not impossible to conceive of a different ruling on this issue, one that focuses on the deterrent purpose of the exclusionary rule and the recognized need for the questioning of suspects with respect to serious crimes. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854 (1973). A plausible different rule, such as the rule recently announced by the Virginia Supreme Court in *Eaton v. Commonwealth,* — Va. —, 397 S.E.2d 385 (Va.1990), is that once a suspect has been advised of his rights and waives them, questioning that does not run afoul of the Constitutional prohibition against self-incrimination may continue until the suspect clearly changes his mind and clearly revokes the waiver of his present right to counsel. In *Eaton,* the Virginia Supreme Court had before it a defendant who, while in custody for multiple homicides, was advised of and waived his *Miranda* rights, and then began to discuss the case with his interrogators. When the interrogation turned to the shooting of a state trooper, the suspect responded by asking, "You did say I could have an attor-

ney if I wanted one"? The police answered his question in the affirmative and told him he did not have to tell them anything. The suspect fell silent. After a brief time, and without any attempt to clarify his thinking on the subject of an attorney, the interrogation resumed, and the suspect made incriminating statements that were used to convict him. In discussing whether the rule of *Edwards v. Arizona* was triggered under these circumstances, the Virginia Supreme Court rendered the following analysis:

> We agree with the trial court that Eaton's utterances concerning his right to counsel were equivocal. Authorities in other jurisdictions have adopted differing standards with respect to the specificity with which a request for counsel must be expressed. Some courts require a clear and unambiguous request, some prohibit all further questioning when the subject of counsel is mentioned in any way, while others permit further questioning only for the purpose of resolving the ambiguity. The United States Supreme Court has not expressly decided the question, *Smith v. Illinois,* 469 U.S. 91, 95–96 [105 S.Ct. 490, 492–93, 83 L.Ed.2d 488] (1984), but has expressed a preference for "bright-line rules" for the guidance of the police who must conduct custodial interrogatories [sic]. *Fare v. Michael C.,* 442 U.S. 707, 718 [99 S.Ct. 2560, 2568, 61 L.Ed.2d 197] (1979).
>
> The trial court, relying on *Poyner v. Commonwealth,* 229 Va. 401, 329 S.E.2d 815, *cert. denied,* 474 U.S. 888 [106 S.Ct. 189, 88 L.Ed.2d 158] (1985) and *Bunch v. Commonwealth,* 225 Va. 423, 304 S.E.2d 271, *cert. denied,* 464 U.S. 977 [104 S.Ct. 414, 78 L.Ed.2d 352] (1983), concluded that the standard prevailing in Virginia is that a request for counsel must be "unambiguous and unequivocal" in order to trigger the *Edwards* rule. We distinguished the facts in *Bunch* from those in *Edwards* by pointing out that "where

**9.** Our court also noted this lack of guidance in 1987 in *Fouche II.* Citing *Connecticut v. Barrett,* 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987), and *Smith v. Illinois,* 469 U.S. 91, 96, 105 S.Ct. 490, 493, 83 L.Ed.2d 488 (1984), Judge

Nelson said, "the Supreme Court has twice explicitly declined to rule on the permissible limits of interrogation following equivocal requests." 833 F.2d at 1287, n. 3.

*Edwards* involved an unequivocal statement by the accused that he wanted counsel, Bunch's statement ... was couched in ambiguous terms to the effect that he might want to talk to a lawyer." *Bunch,* 225 Va. at 433, 304 S.E.2d at 276 (emphasis in original). We noted a further distinction: in *Edwards,* the defendant was told that he had to talk to the police. Bunch, like Eaton, was told that he need not do so. *Id.*

The circumstances in *Poyner* were remarkably close to those of the present case. After police officers had given Poyner *Miranda* warnings, they summarized the information in their possession linking Poyner with one of the murders charged against him. At that point, Poyner asked, "Didn't you say I have the right to an attorney?" The officers said, "Yes." Citing *Bunch,* we held that the defendant's statement was not a request for counsel. "At most, it sought to clarify one of the rights of which he had already been advised." *Poyner,* 229 Va. at 410, 329 S.E.2d at 823. The trial court's view that we have required a clear request for counsel was, therefore, well-founded.

We share the U.S. Supreme Court's preference for "bright-line" rules for the guidance of those who must conduct and evaluate custodial interrogations. In further explication of the views expressed in *Bunch* and *Poyner,* we hold that the *Edwards* rule is invoked, and that custodial interrogation must cease, when the accused, having received *Miranda* warnings and having begun to respond to the questions of the authorities, "has clearly asserted his right to counsel," *Edwards,* 451 U.S. at 485 [101 S.Ct. at 1885] (emphasis added). Because Eaton's words and conduct fell short of that standard, we hold that he failed to invoke his right to counsel and that the *Edwards* rule did not come into play on February 24.

From the foregoing, I conclude that the rule established in *Fouche I* was a logical extension of *Edwards* and its progeny, but I do not think it was "dictated" by it.

Fourth and finally, if the judiciary takes it upon itself to guide the police with rules,

as it has, it must do so fairly. When we penalize the police, and thereby society, we should do so only for not following the published rules, not for failing to anticipate what the next rule will be. To apply rules retroactively is to punish the police for failure to follow somebody who is not yet leading. This serves no deterrent purpose. It is a counterproductive practice that should be avoided as it breeds public disrespect for both the courts and the Constitution. The public understands that consequences attach when rules are broken, but the public's sense of fair play is offended by changing the rules after the game is over. This process differs materially from the process of interpreting the Constitution and applying its mandates to a given situation. In such an exercise, the rule is not being created; it already exists in the Constitution itself and is simply being impressed upon the circumstances of the case.

In sum, I conclude that *Fouche I* and its new rule cannot be applied to Robinson's interrogation, which occurred five years earlier.

Robinson's counsel argues that *Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), and not *Teague v. Lane* should control the issue of whether *Fouche I* should be applied retroactively. I disagree. Even if *Stumes* were controlling, however, I do not believe the *Fouche I* rule would be imposed retroactively. In *Stumes,* the Supreme Court held that the *Edwards* rule—once a suspect has "clearly invoked" his right to counsel, only the suspect may initiate subsequent conversation—did *not* apply retroactively, and it so held for four reasons. First, the *Edwards* rule does not significantly promote the court's truth-finding function, but rather is a prophylactic rule. 465 U.S. at 645, 104 S.Ct. at 1342–43. Second, although *Edwards* did not overrule a prior decision or transform standard practice, it established a new per se rule that was not a necessary consequence of *Miranda.*

We do not think ... police can be faulted if they did not anticipate its per se approach.... [I]t could be justifiably be-

lieved that a waiver of the right to counsel following its invocation could be voluntary even if the police initiated the conversation.

465 U.S. at 647–48, 104 S.Ct. at 1344. Third, judicial guidance was lacking; the courts were in conflict on the issue. Fourth, retroactive application might affect numerous convictions, thereby disrupting the administration of justice.

The reasons given by the Court in *Stumes* are applicable to the present case: (1) This is a prophylactic *rule* that does not promote truth-finding; (2) the police cannot be faulted for failure to anticipate *Fouche I;* (3) judicial guidance—as pointed out earlier—was lacking; and (4) retroactive application might affect numerous convictions. Thus, under either *Stumes* or *Teague,* the result would be the same. *Fouche I* cannot govern Robinson's interrogation. Accordingly, the police failure to follow up on ambiguous references to an attorney did not violate the *Miranda* rules in place at the time, and is not a basis for granting Robinson's petition for a writ of habeas corpus.[10] To alter slightly a thought from Justice Cardozo, the constable did not blunder, thus the criminal should not go free.[11]

### V

California suggests we should refuse to hear Robinson's *Miranda* complaints on the ground that the rationale of *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), should foreclose collateral review of these issues. Although we rejected this argument in *Hinman v.*

*McCarthy,* 676 F.2d 343, 349 (9th Cir.), *cert. denied,* 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982), Justice O'Connor in a concurring opinion in *Duckworth v. Eagan,* —— U.S. ——, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (O'Connor, J., concurring), makes a persuasive case that this issue should be revisited.

I quote Justice O'Connor:

In *Stone v. Powell* this Court held that claims that probative evidence should have been excluded at trial because of police conduct alleged to have violated the Fourth Amendment would not be entertained in a federal habeas proceeding where a full and fair opportunity to litigate the claim had been made available in the state courts. The *Stone* Court noted that the exclusionary rule " 'is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.' " 428 U.S., at 486, 96 S.Ct. at 3048, quoting *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). The costs of such a rule are high: highly probative and often conclusive evidence of a criminal defendant's guilt is withheld from the trier of fact in the hope of "encourag[ing] those who formulate law enforcement policies, and the officers who implement them, to incorporate Fourth Amendment ideals into their value system." *Stone, supra,* 428 U.S., at 492, 96 S.Ct. at 3051. The exclusionary rule is a structural device designed to promote sensitivity to constitutional values through its deterrent effect. As such, the rule's utility must, as this

---

**10.** Counsel for Robinson suggests that this issue has already been decided in favor of retroactivity, citing *Bruni v. Lewis,* 847 F.2d 561 (9th Cir.), *cert. denied,* 488 U.S. 960, 109 S.Ct. 403, 102 L.Ed.2d 391 (1988); *Robtoy v. Kincheloe,* 871 F.2d 1478 (9th Cir.1989) *cert. denied,* —— U.S. ——, 110 S.Ct. 1483, 108 L.Ed.2d 619 (1990); *Norman v. Ducharme,* 871 F.2d 1483 (9th Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1483, 108 L.Ed.2d 619 (1990). Although these cases applied *Fouche* retroactively, the issue was not discussed or presented in those cases. Thus they are not controlling as the law of the circuit on this question.

**11.** This case provides an opportunity to reaffirm "the need for police questioning as a tool for

effective enforcement of criminal laws." *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854 (1973). Society currently needs all available and civilized tools to protect itself from crime, not just those available in a laboratory. To quote *Schneckloth:* "At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal law. Without such investigations, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished." 412 U.S. at 225, 93 S.Ct. at 2046 (citations omitted).

Court has long recognized, be weighed against other important values in its application. Where the rule's deterrent effect is likely to be marginal, or where its application offends other values central to our system of constitutional governance or the judicial process we have declined to extend the rule to that context. *See, e.g., United States v. Leon,* 468 U.S. 897, 920–921, 104 S.Ct. 3405, 3419, 82 L.Ed.2d 677 (1984) (refusing to apply exclusionary rule where police rely in good faith on a warrant issued by a neutral magistrate); *Calandra, supra,* 414 U.S., at 349, 94 S.Ct. at 620–21 (refusing to extend the rule to grand jury proceedings because its application "would seriously impede the grand jury"); *Walder v. United States,* 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954) (exclusionary rule does not create "a shield against contradiction of [the defendant's] untruths" and evidence seized in violation of the Fourth Amendment may be used for impeachment purposes).

In *Stone,* we found that application of the exclusionary rule to Fourth Amendment violations on federal habeas was likely to have only marginal effectiveness in deterring police misconduct, while offending important principles of federalism and finality in the criminal law which have long informed the federal courts' exercise of habeas jurisdiction. In my view, this same weighing process leads ineluctably to the conclusion that the suppression remedy should not be available on federal habeas where the state courts have accorded a petitioner a full and fair opportunity to litigate a claim that *Miranda* warnings were not given or were somehow deficient. Indeed, the scales appear to me to tip further toward finality and repose in this context than in *Stone* itself.

The Fifth Amendment guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The Amendment has its roots in the Framers' belief that a system of justice in which the focus is on the extraction of proof of guilt from the crimi-

nal defendant himself is often an adjunct to tyranny and may lead to the conviction of innocent persons. Thus, a violation of the constitutional guarantee occurs when one is . "compelled" by governmental coercion to bear witness against oneself in the criminal process. See *Colorado v. Connelly,* 479 U.S. 157, 163–164, and n. 1, 107 S.Ct. 515, 520–21, and n. 1, 93 L.Ed.2d 473 (1986); *Malloy v. Hogan,* 378 U.S. 1, 6–8, 84 S.Ct. 1489, 1492–94, 12 L.Ed.2d 653 (1964). The suppression remedy is quite possibly contained within the guarantee of the Fifth Amendment itself.

The *Miranda* rule is not, nor did it ever claim to be, a dictate of the Fifth Amendment itself. The *Miranda* Court implicitly acknowledged as much when it indicated that procedures other than the warnings dictated by the Court's opinion might satisfy constitutional concerns, see *Miranda,* 384 U.S., at 444, 86 S.Ct. at 1612, and what was implicit in the *Miranda* opinion itself has been made explicit in our subsequent cases. See, *e.g., Oregon v. Elstad,* 470 U.S. 298, 306–310, 105 S.Ct. 1285, 1291–94, 84 L.Ed.2d 222 (1985) (noting that the *Miranda* rule "sweeps more broadly than the Fifth Amendment itself" and "may be triggered even in the absence of a Fifth Amendment violation"); accord *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *Michigan v. Tucker,* 417 U.S. 433, 442–446, 94 S.Ct. 2357, 2362–2365, 41 L.Ed.2d 182 (1974). Like all prophylactic rules, the *Miranda* rule "overprotects" the value at stake. In the name of efficient judicial administration of the Fifth Amendment guarantee and the need to create institutional respect for Fifth Amendment values, it sacrifices society's interest in uncovering evidence of crime and punishing those who violate its laws. While this balance of interests may be perfectly justified in the context of direct review of criminal convictions, in my view the balance shifts when applied to a presumptively final criminal judgment which is collaterally

attacked in a federal habeas corpus proceeding.

—— U.S. at ——, 109 S.Ct. at 2882–83.

In the instant case, the courts of California afforded Mr. Robinson a full and fair opportunity to litigate his *Miranda* claims. The record shows that the state trial court conducted a full evidentiary hearing on Robinson's motion to suppress. The superior court judge listened to the tape recording of the interrogation, reviewed the transcript, took live testimony, and heard argument. Robinson then appealed to the California Court of Appeal, which ruled that the trial court's denial of the motion to suppress was amply supported by the record.[12] The California Supreme Court denied Robinson's petition for a hearing, which failed to mention any *Miranda* issue. Two subsequent petitions for writs of habeas corpus, which did raise the issues now before this court, were also denied.

To apply the reasoning of Justice O'Connor's concurring opinion, numerous state and federal judges have considered Robinson's claims. No one has raised any doubt as to his guilt, the voluntariness of his incriminating statements, or their substantive value. It will accomplish nothing to discipline now behavior that occurred in 1980 on the basis of a case decided in 1985. "[I]t is absurd to think that this added possibility of exclusion [of the evidence] years after the police conduct at issue will have any appreciable effect on police training or behavior." *Id.* at 2884. *Fouche I* is firmly in place. It has been controlling the activities of police for five years. It will do nothing to confirm the status quo or to promote progress to apply it to this case.

Accordingly, I would affirm the district court.

---

**12.** The unpublished opinion of the Second Appellate District of the Court of Appeal, 2d Crim. No. 42532, filed May 4, 1984, reveals that Robinson, although represented by distinguished counsel, did not raise the issue which is now central to his case. The only *Miranda* issue discussed related to the validity of his initial waiver on being advised of his rights.