[No. B087248. Second Dist., Div. Seven. Feb. 20, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE MACK WALTON, Defendant and Appellant.

[No. B098223. Second Dist., Div. Seven. Feb. 20, 1996.]

In re WILLIE MACK WALTON on Habeas Corpus.

COUNSEL

Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Marc E. Turchin, and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WOODS (Fred), J.**—A jury convicted appellant of second degree murder (Pen. Code, § 187; statutory references, unless otherwise noted, are to the Penal Code) and found true a personal use of a knife allegation (§ 12022, subd. (b)). Appellant admitted a prior felony conviction allegation (§§ 667, subd. (a), 667.5, subd. (b)).

Appellant contends the trial court erred in its evidentiary rulings, in its instruction defining malice, and in not appointing an advisory attorney. Appellant also contends the prosecutor committed misconduct.

In the consolidated habeas corpus petition additional errors are claimed.

We find no prejudicial error, deny the habeas corpus petition, and affirm the judgment.

## FACTUAL BACKGROUND

There being no insufficiency of evidence claim, the facts may be stated simply. Our perspective favors the judgment. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110].)

About 3:45 p.m. on April 21, 1992, appellant boarded a bus at LaBrea and Venice in Los Angeles. The bus was crowded with high school students and other passengers. Appellant walked to the rear of the bus and remained standing. A short time later, Victor Fuerte boarded the bus, went to the rear, and sat down. Mr. Fuerte then said, "It smells in here." Appellant asked him, "Are you talking about me?" Mr. Fuerte said he was not. Mr. Fuerte stood, opened a vent, and sat down.

Appellant tried to close the vent and he and Mr. Fuerte argued. Each used racial epithets. Appellant is Black and Mr. Fuerte was Hispanic.

Appellant, standing over Mr. Fuerte, stated, "If you put your finger in my face, I'm going to kill you." Appellant then removed a long knife from a black bag and stabbed Mr. Fuerte in the chest. The knife penetrated six inches and punctured Mr. Fuerte's heart. Appellant withdrew the knife, returned it to the black bag, and sat down.

Pandemonium occurred and the driver stopped the bus. She activated a silent alarm. Appellant asked her for a transfer and exited the bus. He then boarded another bus but when it was flagged down by several of the high school student witnesses, appellant exited and started to walk away.

The police arrived, learned what had occurred, and saw appellant walking south on Crenshaw. They ordered him to stop and raise his hands. Appellant threw down the black bag and the knife fell out. It had Mr. Fuerte's blood on it. Appellant was arrested.

Appellant represented himself at trial and did not testify.

DISCUSSION

1. *Appellant contends the trial court erred in excluding the preliminary hearing testimony of an unavailable witness.*

█ Former testimony may be admissible if the witness is unavailable (Evid. Code, § 1291) and the proponent "has exercised reasonable diligence . . . to procure his . . . attendance . . . ." (Evid. Code, § 240, subd. (a)(5).)

Appellant sought to introduce the preliminary hearing testimony of Joseph Dupree, a bus passenger. To establish reasonable diligence appellant called his investigator Charles Watson.

Mr. Watson testified he obtained Joseph Dupree's name from the prosecutor's witness list and, on December 23, 1992, went to Mr. Dupree's apartment building. The apartment manager told him Joseph Dupree and his mother, Betty Williams, were evicted a month ago. Mr. Watson checked with the post office but neither 18-year-old Mr. Dupree nor his mother had a forwarding address. Mr. Watson telephoned Hamilton High School and learned Mr. Dupree had graduated. Finally, Mr. Watson checked with a high school friend of Mr. Dupree who said *he* would try to locate Mr. Dupree. Mr. Watson contacted this friend once in 1992 and once in 1993—without results. This friend moved to Miami sometime in 1993, Mr. Watson did not know when. Mr. Watson made no effort to locate Mr. Dupree after this 1993 contact with Mr. Dupree's friend. The trial occurred in April 1994.

Mr. Watson admitted he did *not* do any of the following: check with the Department of Motor Vehicles to determine if either Mr. Dupree or his mother had a driver's license; check local hospitals; check local jails; obtain Mr. Dupree's high school records; ask the district attorney for a current address.

Mr. Watson did not claim to have contacted phone companies, the gas company, or the department of water and power; voter registration; unions; Social Security; welfare agencies; the Army, Navy, or Marine Corps.

When asked by the trial court "Do you think you did everything you could have to get this individual into court?," Mr. Watson answered "no."

Appellant asserts "reasonable diligence" was established and that the review standard is not abuse of discretion but independent review. We disagree.

We recently considered the review standard for reasonable diligence and after analyzing all the applicable authorities concluded the appropriate standard was abuse of discretion. (*People* v. *Saucedo* (1995) 33 Cal.App.4th 1230, 1234-1236 [40 Cal.Rptr.2d 153].) We still believe so.

" ' "Whether due diligence has been shown is a factual question to be determined according to the circumstances of each case. . . . Unless there has been an abuse of discretion, the ruling of the trial judge will not be disturbed. . . ." ' " (*People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].)

For Mr. Watson to have done so little and to have failed to do so much, we cannot say the trial court abused its discretion in ruling his efforts fell short of reasonable diligence.

2. *Appellant contends the prosecutor committed misconduct.*

■ Appellant's defense was self-defense. To establish it he called a friend, Gary Shaw. Mr. Shaw testified he had been on the bus with appellant and that appellant stabbed the victim only after the victim punched appellant in the face and threatened him with a knife. Mr. Shaw admitted to a felony conviction.

Appellant contends it was misconduct for the prosecutor to thwart introduction of Joseph Dupree's former testimony (allegedly corroborative of Gary Shaw's testimony) and then argue Gary Shaw's testimony was not credible because it was not corroborated. The contention is not well taken for two reasons. First, it was the absence of physical—not testimonial—corroboration upon which the prosecutor relied. Second, appellant failed to object to the prosecutor's absence of corroboration argument, waiving the issue on appeal.

To provide context we quote an extended portion of the prosecutor's argument.

"Let's look at the corroboration of the two kids that were on the bus. Everybody, all of the experts, all of the police officers that examined Mr. [Fuerte] told you there were no bruises on his body and no defensive wounds. You remember I asked the detective, a defensive wound is something that you see when someone's engaged in mutual combat, in a fist fight.

"That's right.

"It wasn't there. There was no bruising on the defendant's [*sic*] knuckles or hands that would indicate he'd punched Mr. Walton [appellant] because it didn't happen that way.

"More corroboration. The knife was never found. Now don't you think if Mr. Fuerte had produced a big knife and was just about to stab Mr. Walton

right before he fell back into that corner of the bus where he was found dead, don't you think that knife still would have been at the scene? Yes. The police were there within two to three minutes. There was no knife. That's why no knife was recovered because the only person that tells you there was a knife is his friend, Mr. Shaw.

"Finally, you have the testimony of all of the People's witnesses, in terms of people that were there. Both of the kids, Officer Mena, and Laura Sobranes [the bus driver] told you that when they stopped that second bus, one guy got off, this defendant. One guy came down the street, this defendant.

"Let's look at the testimony of Gary Shaw. He's been convicted of a felony. No, *that's not something that should cloud you completely but it's a* factor to consider in determining somebody's credibility on the witness stand. More importantly than that, he's been a friend of this defendant's since at least 1988. He had a reason to get up there and tell you what he told you. If you think about it, the only person that says that Gary Shaw was on that bus is Gary S[h]aw. There's no other testimony that he was on that bus. He was never interviewed.

"Don't you think it's a little strange that if his friend was being accosted by the police, dragged around, handcuffed, taken to the police station, that he would have stopped somebody and said, 'Listen to me. I'm trying to tell you, an innocent man is going to jail. What are you doing?' Don't you think he would have gone down to the police station and tried to tell somebody? If they didn't listen to him, surely he would have come to the D.A.'s office. He could have talked to Mr. Garcetti himself, gone to the papers, said, 'I'm not getting any help and once again an innocent man is being discriminated against.'

"He never ever came forward. He wasn't even interviewed by Mr. Watson, the defense investigator. Because, you see, the first time that we heard about this story of Gary Shaw being on the bus and these three Hispanics ganging up on the defendant, was when he knew he had to come up with something to tell you because those two kids got up there and told the truth.

"Mr. Walton: She's twisting, your Honor, objection.

"The Court: Overruled. Overruled.

"[The Prosecutor]: *There is absolutely no corroboration for the testimony of Gary Shaw,* this defendant's friend. (Italics added.) Like I said before, if

you believe Mr. Shaw, if you believe that story, that is not supported by any of the physical evidence or any of the evidence that was found at the crime scene, it is self-defense. I'm not denying that. If you believe that man, it's self-defense. If you don't, it's second degree murder."

As the record demonstrates, it was when the prosecutor referred to appellant's motive in calling Gary Shaw that appellant objected "she's twisting." Later, when the prosecutor stated "There is absolutely no corroboration for the testimony of Gary Shaw," appellant failed to object. That failure precludes appellate review. (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40]; *People* v. *Wrest* (1992) 3 Cal.4th 1088, 1105 [13 Cal.Rptr.2d 511, 839 P.2d 1020]; *People* v. *Ashmus* (1991) 54 Cal.3d 932, 975-976 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

3. *Appellant contends the trial court wrongfully "hinged" its ruling on the admissibility of victim character evidence.*

■ "In a criminal action, evidence of . . . a trait of character . . . of the victim . . . is not made inadmissible . . . if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the . . . trait of character." (Evid. Code, § 1103, subd. (a).)

Appellant offered such evidence through the testimony of Ronald Campbell. He was prepared to testify[1] that on November 1, 1991, he, appellant, and others were across the street from the Frontier Hotel when he saw the victim, Mr. Fuerte, strike a woman on the head with his fist.

At the conclusion of the section 402 hearing (Evid. Code, § 402), the following colloquy occurred.

"The Court: All right. I reviewed 1103 of the Evidence Code.

"It would appear that evidence of character of the victim, including evidence of specific instance of misconduct, or of conduct of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by section 1101 if the evidence is, one, offered by the defendant to prove conduct of the victim in conformity with the character or trait of character . . . .

---

[1]Appellant reiterated his intention not to testify.

"Now, the killer for you, Mr. Walton, is that if you put on evidence of the victim's bad character, then she [the prosecutor] can load up on you and put evidence of your bad character under subsection (b)[2] of this code section.

"Ms. Burns: And, Mr. Walton, just to be fair to you and let you know, I have all of your prior stabbings that go all the way back to '77, and I've got witnesses subpoenaed. Including the one where a Mexican pointed a finger in your face and you stabbed him. Including the 1985 crime that you were convicted of where you stabbed a woman on the bus. Including the 1985 187 [Penal Code § 187; murder] that was never filed against you because they couldn't find the witnesses where you stabbed the victim.

"The conviction of a lesser included offense of the 242 where the cop comes in and sees you washing off the knife and you and your partner in crime on that occasion say, 'Yeah, we stabbed him real good, we got him, didn't we?'

"And just to put you on notice now in an abundance of fairness, I have police reports and I have witnesses on most of them.

"Mr. Walton: Well, first of all—

"The Court: Wait a minute. Wait a minute. This isn't a debate with you and her.

"You have to decide, do you want to put Mr. Campbell back on the stand and ask him about this instance where you saw the guy hit a woman over the head, saw the victim hit a woman over the head with his fist. If you want it, I'll let you put it on."

In light of the trial court's ruling appellant withheld Mr. Campbell's testimony concerning the victim.

Appellant now contends the trial court erred because the subject testimony was not offered pursuant to Evidence Code section 1103, subdivision (a)— which allows prosecution rejoinder under subdivision (b)(see fn. 2, *ante*)—

---

[2]Subdivision (b) provides: "In a criminal action, evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)."

but pursuant to Evidence Code section 1101, subdivision (b),[3] which does not allow such prosecution rejoinder. We reject the contention.

First, because appellant made no such distinction in the trial court he may not urge such a distinction on appeal.

Second, such an attempted distinction is unavailing. The identical argument was made and rejected in *People* v. *Clark* (1982) 130 Cal.App.3d 371, 384 [181 Cal.Rptr. 682]. The court stated: "Defendant raised the issue of self-defense. He attempted to show that at the time of the homicide David was in a violent rage and approached him in a speedy and furious manner so that he was justified in reacting with deadly force. In support of this theory he directed his case at establishing the violent character of the victim. In view of this evidence the rebuttal evidence introduced by the People was proper.

"Defendant argues, however, he did not intend to prove the victim's character for violence,—he only sought to show his personal knowledge of the victim. We reject such a contention. The evidence introduced by defendant was directly probative of the victim's character for violent behavior on the fatal day. In view of this evidence neither the court nor the prosecution was required to accept defendant's representation that he intended only to prove his personal knowledge of the victim. We find no error in the introduction of the character evidence in rebuttal." (130 Cal.App.3d at p. 384; see also *People* v. *Blanco* (1992) 10 Cal.App.4th 1167, 1171-1176 [13 Cal.Rptr.2d 176].)

4. *Appellant contends the trial court erred in defining "malice."*

■ In initially defining "malice" the trial court read CALJIC No. 8.11[4] to the jury. When, during their deliberations, they requested a further definition the court instructed them "Malice involves an element of viciousness and extreme indifference to human life. It is when a defendant, free

---

[3]The subdivision provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

[4]The instruction provides: " 'Malice' may be either express or implied.

"Malice is express when there is manifested an intention unlawfully to kill a human being.

"Malice is implied when:

"1. The killing resulted from an intentional act,

"2. The natural consequences of the act are dangerous to human life, and

"3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

from any mental impairment and not acting in the heat of passion or on adequate provocation, makes a voluntary choice to commit a person-endangering act."[5]

Appellant has no quarrel with CALJIC No. 8.11 but contends the trial court's later instruction removed the mental component from "malice." Appellant argues this instruction allowed the jury to find malice "simply from 'a voluntary choice to commit a person-endangering act'." We disagree.

Appellant's interpretation of the instruction is unreasonable. A reasonable juror would *not* understand the instruction to mean that one could be utterly unaware one's act was highly dangerous to human life and act with malice. The instruction plainly states the opposite: "Malice involves an element of viciousness and extreme indifference to human life."

5. *Appellant contends the trial court should have prohibited the testimony of a witness.*

██ Section 1054.5, subdivision (c) authorizes a court to "prohibit the testimony of a witness" when a discovery violation has occurred, but "only if all other sanctions have been exhausted."

Appellant contends the trial court should have prohibited prosecution witness Dean Tobias from testifying because the prosecutor failed to disclose him as a witness "at least 30 days prior to the trial." (§ 1054.7.) We disagree.

Prior to trial, during jury selection, the prosecutor located eyewitness Dean Tobias. The next morning she informed appellant. Appellant objected and this colloquy occurred:

"The Court: When did you find out about this witness, Miss Burns?

"Ms. Burns: Last night at approximately 9:00 p.m., Your Honor. [¶] This witness was listed on one of the F.I. [field interview] cards that was provided

---

"When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.

"The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.

"The word 'aforethought' does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act."

[5]The definition was a quotation from *People* v. *Summers* (1983) 147 Cal.App.3d 180, 184 [195 Cal.Rptr. 21].

to the defendant. We attempted to contact him at the address that was listed on the F.I. card or someone did during that 18-month period. It was a bad address, he had moved.

"I called Miss Cutliff, who is someone the defendant has had his investigator interview. I found her. I talked to her mother. She was very hesitant about coming in and testifying because she's an 18-year-old kid and she's scared.

"During the two days that I tried to persuade her to come to court because I had not achieved service on her, I spoke one time to an individual named Deon and he did not identify himself any further.

"Last night when I called, he said, 'You're the D.A.? I said, 'Yeah?'

"He said, 'I was on the bus, too. I know what happened. I talked to a cop.'

"So I flipped through the F.I. cards, I saw that his name was in there, and at 9:00 o'clock last night I said, 'A detective will be picking you up in the morning because I want to write a statement down.'

"First thing this morning he wrote that statement. I got a copy of that statement to Mr. Walton by 10:00 a.m. this morning and I will make that witness available to him so that he can interview him before putting him on the stand. It's newly discovered evidence."

The trial court did not abuse its discretion in permitting the witness to testify. Until the prosecutor was able to locate the witness she could not "intend to call" him as a witness. (§ 1054.1.) Once she did locate him she promptly fulfilled her disclosure duty. Moreover, appellant was provided with the witness's statement and was afforded an opportunity to interview the witness before he testified. If appellant required additional time to prepare for the witness's testimony he neglected to request it.

6. *Appellant contends the trial court erred in refusing to appoint advisory counsel.*

A month before trial appellant asked that standby counsel (Lawrence Forbes) be appointed advisory counsel. The only reason appellant gave for his request was "that way he can be an active part of this trial." Superior Court Judge John W. Ouderkirk stated "I see no reason to do it" and denied the request. Appellant claims error. We disagree.

"California courts have discretion to appoint advisory counsel to assist an indigent defendant who elects self-representation. . . . When a defendant

requests appointment of advisory counsel, a court's failure to exercise its discretion is serious error and its denial of a request for advisory counsel in a capital case may constitute an abuse of discretion." (*People* v. *Crandell* (1988) 46 Cal.3d 833, 861 [251 Cal.Rptr. 227, 760 P.2d 423], internal citations omitted.)

In the instant case there was no failure to exercise discretion and this was not a capital case.

As was true in *People* v. *Crandell*, appellant "appeared before the superior court as an obviously intelligent, literate, and articulate advocate in his own cause who had acquitted himself well at the preliminary hearing. He had brought discovery and numerous other motions, had subpoenaed witnesses, and had engaged in skillful examination and cross-examination at the preliminary hearing. Defendant had demonstrated in his motion papers an ability to research the law, to cite applicable precedent, and to engage in reasoned argument." (*People* v. *Crandell*, *supra*, 46 Cal.3d at p. 864.)

Additionally, the record discloses appellant was 53 years old, graduated from high school, attended Los Angeles City College from 1966 to 1969, and participated in a University of California, Los Angeles, extension program in 1973. Moreover, although designated a "standby" attorney, Mr. Forbes regularly attended the trial and frequently consulted with appellant. Finally, appellant was assisted by an investigator, a "runner," and court appointed experts.

A trial court has "discretion to deny as well as to grant [a motion for advisory counsel]. A discretion which can be exercised in one way only, or which is shackled by rigid rules regarding its exercise, is no discretion at all." (*People* v. *Crandell*, *supra*, 46 Cal.3d at p. 863.)

We find no abuse of discretion.

HABEAS CORPUS PETITION

1. *Inadequate funds for legal supplies.*

Appellant claims he was provided inadequate funds for legal supplies. To support his claim he cites a single cryptic exchange with the trial judge 16 months prior to trial. Appellant does not claim he made additional legal supply requests or that such requests were denied. Nor does appellant specify how he was prejudiced by inadequate legal supplies. We find the claim without merit.

2. *Wheeler (People* v. *Wheeler (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]) error.*

■ Without citations to the record, appellant claims the trial court wrongly threatened to disallow his next peremptory challenge to a Hispanic juror[6] and this threat intruded upon his right to a jury trial. The claim is meritless.

Appellant's first and second peremptory challenges were to Hispanic surnamed jurors. When he attempted to challenge a third Hispanic juror the prosecutor objected. The trial court denied the *Wheeler* objection and merely informed appellant the People were going to scrutinize such future challenges and he would have "to justify the exclusion of that person." The trial court similarly admonished the prosecutor regarding challenges to Black jurors.

3. *"Cooling Period."*

■ Appellant appears to claim it was error for the court to instruct on "cooling period" (CALJIC No. 8.43) because as a matter of law his "heat of passion" could not have cooled. He is mistaken. Like "heat of passion" the "cooling period" is a factual matter for the jury to decide.

4. *Exclusion of 1988 stabbing.*

■ Appellant sought to have Gary Shaw testify that in 1988 he saw someone—*not* the victim—stab appellant. The prosecutor objected on relevancy grounds and the trial court asked for an offer of proof. Appellant stated, "This is going to the fact that when I'm in an altercation or serious confrontation because of the times that I have been injured and nearly killed, I'm aware or be aware and alert of what's going on around me."

The trial court excluded the evidence as irrelevant. We find no error.

5. *Prosecutorial misconduct.*

Appellant claims the prosecutor committed misconduct during final argument.

We have examined the record and find the prosecutor's argument to be "vigorous . . . [but] fair comment on the evidence." (*People* v. *Sassounian* (1986) 182 Cal.App.3d 361, 396 [226 Cal.Rptr. 880].)

---

[6]Appellant makes similar claims regarding Filipino and Caucasian jurors.

6. *Restitution.*

 The court ordered that appellant pay a restitution fine of $1,000. Appellant claims the trial court failed to weigh his ability to pay this sum. Appellant is mistaken. The trial court informed appellant that prison authorities would "take it out of your prison wages." Since appellant was given a 17-year prison sentence the restitution fine does not appear disproportionate.

7. *Custody credits.*

 The trial court awarded appellant 1,132 days total custody credit. Appellant, although given an opportunity to object, made no objection to this award. He now claims he is entitled to additional custody credits.

When, as here, a party has failed to object to a custody credit error in the trial court, the custody credit error is de minimis, the sentence is lengthy, and other issues dominate the appeal—we shall not entertain an issue of custody credit error. (See generally, *People* v. *Frye* (1994) 21 Cal.App.4th 1483 [27 Cal.Rptr.2d 52], *People* v. *Menius* (1994) 25 Cal.App.4th 1290, 1297-1299 [31 Cal.Rptr.2d 15].)

8. *Involuntary manslaughter.*

 The trial court instructed the jury concerning threats and menaces (CALJIC No. 4.40), resisting an attempt to commit a felony (CALJIC No. 5.10), self-defense (CALJIC Nos. 5.12 (1989 rev.), 5.13, 5.30), burden of proof regarding justification or excuse (CALJIC No. 5.15), honest but unreasonable belief in necessity to defend (CALJIC No. 5.17), assailed person need not retreat (CALJIC No. 5.50), actual danger not necessary (CALJIC No. 5.51), murder (CALJIC No. 8.10), malice aforethought (CALJIC Nos. 8.11, 8.30, 8.31), manslaughter-defined (CALJIC No. 8.37), voluntary manslaughter (CALJIC Nos. 8.40 (1989), 8.42 (1991 rev.), 8.43, 8.44) and murder and manslaughter distinguished (CALJIC No. 8.50).

The trial court did not give an involuntary manslaughter instruction. Appellant contends the omission was error. We disagree.

As this court recently observed: "*People* v. *Flannel* explicitly disapproved the 'any evidence' test for jury instructions. It stated: 'Many cases cite, often without elaboration, language in [*People* v.] *Carmen* [(1951)] 36 Cal.2d 768 [228 P.2d 281], or in *People* v. *Modesto* (1963) 59 Cal.2d 722, 729 [31 Cal.Rptr. 225, 382 P.2d 33], to the effect that jury instructions must be given whenever *any* evidence is presented, no matter how weak. To the extent that

a decision of any court interprets these cases to require instructions without evidence substantial enough to merit consideration, it is disapproved.' (*People* v. *Flannel* [(1979)] 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]) Since *Flannel*, our Supreme Court has consistently held '[a] trial court need only give those requested instructions supported by evidence that is substantial.' (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 125 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 305 [168 Cal.Rptr. 603, 618 P.2d 149].)" (*People* v. *Franco* (1994) 24 Cal.App.4th 1528, 1539 [30 Cal.Rptr.2d 478].)

There was no substantial evidence that the killing of Mr. Fuerte was involuntary manslaughter. The prosecution offered evidence appellant threatened to kill the victim and then fatally plunged a knife into his heart. The defense offered evidence the victim first threatened appellant with a knife and then appellant stabbed the victim to death. Appellant did not testify. Although there was substantial evidence of self-defense, "imperfect" self-defense, and heat of passion—there was not substantial evidence of involuntary manslaughter.

DISPOSITION

The judgment is affirmed and the habeas corpus petition is denied.

Lillie, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 29, 1996.