53 Cal.App.4th 270 (1997)
THE PEOPLE, Plaintiff and Respondent,
v.
RICARDO H. ROBINSON, Defendant and Appellant.
Docket No. B089378.
Court of Appeals of California, Second District, Division Seven.
March 4, 1997.
*273 COUNSEL
Patricia L. Watkins, under appointment by the Court of Appeal, for Defendant and Appellant.
Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Sanjay T. Kumar and Brad D. Levenson, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
WOODS, J.
In this retrial for crimes committed in 1980, a jury convicted appellant of first degree murder (Pen. Code, § 187; count I) (statutory references, unless otherwise noted, are to the Penal Code), mayhem (§ 203; count II), assault with chemicals (§ 244; count III), and conspiracy (§ 182; count IV).
Appellant contends the trial court (1) abused its discretion in refusing to appoint William Genego as his attorney, (2) erred by refusing to allow Shauna Weeks to act as appellant's advisory counsel, (3) erred in telling appellant if he chose to represent himself he could not reassert his right to counsel, (4) erred in allowing the prosecutor to question appellant about statements obtained in violation of Miranda, and (5) erred in answering the jury's question about a great bodily injury allegation.
We find all but appellant's last contention without merit and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
There being no insufficiency of evidence claim, the facts may be stated simply. Our perspective favors the judgment. (People v. Barnes (1986) 42 Cal.3d 284, 303-304 [228 Cal. Rptr. 228, 721 P.2d 110].)
In 1980 Patricia Worrell was in her last year of law school and, with her 13-year-old son William, lived in Sylmar, California. At school, she had met and became engaged to Richard Gilman but sometime before August 1980, against his wishes, she ended their six-month relationship.
A short time later, Gilman met a prostitute in Las Vegas and asked if she knew someone who would beat up his former girlfriend. Kim Bricker, the prostitute, recommended her pimp, Bobby Ray Savage.
*274 Savage called Gilman and agreed to beat up or disfigure Patricia Worrell for $1,500. Gilman gave him an advance of $750.
Savage asked Robert Davis to rent a car and the two drove to California. They found Patricia Worrell's house, parked, and Savage walked to the house. He returned to the car and told Davis there were too many people in the house.
Savage and Davis then drove to Hollywood, went to a nightclub, talked to a nude dancer named Corey, and the three of them drove back to Las Vegas.
Gilman, impatient the job had not been done, repeatedly called Kenney's Bail Bonds, where Savage worked, and left threatening messages for Savage.
Apprehensive about Gilman's threats, Savage told a new acquaintance, appellant, about the "job." Appellant said he would do it. Appellant telephoned Gilman and for $1,000 agreed to disfigure Patricia Worrell by throwing lye in her face.
Appellant and Savage bought a can of drain cleaner in crystal form, poured it into a glass jar, and added water. On August 14, 1980, appellant rented a car and he and Savage drove to Sylmar. They arrived at Patricia Worrell's house about 10:30 p.m. and saw a car parked in the driveway.
Savage told appellant he would turn on the parked car's lights so appellant could get the victim to open the front door.
Inside the house, Patricia Worrell and Gilman were playing cards in the living room. William was in bed asleep.
When she and Gilman heard the knock at the door, Gilman told Patricia Worrell to answer it. She went to the door and asked who was there. When told her car lights were on she opened the door and saw a Black man in his 20's, appellant, who threw a burning liquid in her face.
She fell to the floor screaming. Gilman helped her to the shower, woke William, and drove the three of them to the hospital. The lye burned her face, blinded her right eye, ate through her esophagus, and 10 days later, caused her death.
Appellant and Savage returned to Las Vegas, went to Savage's motel room and, in Kim Bricker's presence, talked about what had happened.
In 1982, Gilman and appellant were tried and convicted of first degree murder and other crimes against Patricia Worrell. Their convictions were *275 affirmed on appeal (People v. Gilman (1984) 156 Cal. App.3d 760 [203 Cal. Rptr. 6]), and the California Supreme Court denied appellant's petition for review.
Savage was separately tried and convicted of first degree murder and related offenses.
Appellant sought habeas relief from the superior court and Court of Appeal. His petitions were denied. Appellant's federal habeas corpus petition was denied by the district court but granted by a divided Ninth Circuit Court of Appeals (Robinson v. Borg (9th Cir.1990) 918 F.2d 1387).
Prior to the instant July 1994 retrial, appellant sought to have William Genego appointed as his attorney. The trial court (Superior Court Judge Leon S. Kaplan) declined the request and appointed other counsel. Appellant filed a petition for a writ of mandate with this court which, on October 27, 1992, we denied. (Robinson v. Superior Court (Oct. 27, 1992) B069083 [nonpub. opn].)
Before trial, appellant's request to represent himself was granted.
Following his conviction appellant filed the instant appeal.

DISCUSSION

1. Appellant contends the trial court abused its discretion in refusing to appoint William Genego as his attorney.

(1a) Appellant contends that Superior Court Judge Leon S. Kaplan[1] abused his discretion when, on July 9, 1992, he refused to appoint William Genego to represent him at his retrial.
(2) Respondent asserts we are precluded from addressing the merits of this contention because our October 27, 1992, decision (Robinson v. Superior Court, supra, B069083) considered and rejected the identical claim and is, therefore, the law of the case. Respondent is mistaken.
Although we requested, received, and considered an opposition brief to appellant's petition (Robinson v. Superior Court, supra, B069083) and denied the petition on the merits ("The petition is denied as petitioner has not demonstrated abuse of discretion") we did not issue an alternative writ nor *276 entertain oral argument. The rule is clear: "... the denial of a writ petition does not establish law of the case unless the denial is accompanied by a written opinion following the issuance of an alternative writ." (Kowis v. Howard (1992) 3 Cal.4th 888, 891 [12 Cal. Rptr.2d 728, 838 P.2d 250], italics added; see also People v. Medina (1972) 6 Cal.3d 484 [99 Cal. Rptr. 630, 492 P.2d 686].)
In considering the merits of appellant's contention we apply the following legal standard.
"`"Judicial discretion is that power of decision exercised to the necessary end of awarding justice based upon reason and law but for which decision there is no special governing statute or rule. Discretion implies that in the absence of positive law or fixed rule the judge is to decide a question by his view of expediency or of the demand of equity and justice.... The term implies absence of arbitrary determination, capricious disposition or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason. Discretion in this connection means a sound judicial discretion enlightened by intelligence and learning, controlled by sound principles of law, of firm courage combined with the calmness of a cool mind, free from partiality, not swayed by sympathy or warped by prejudice or moved by any kind of influence save alone the overwhelming passion to do what is just."'...
(3) "It is well established that an indigent defendant, even in a capital case, may not force the trial court to appoint a particular attorney.... The additional fact that the requested attorney is willing and available to represent the defendant does not compel the appointment of the requested attorney.... Moreover, appointment of the requested attorney is not compelled because the defendant unexplainedly lacks confidence in and refuses to cooperate with any attorney other than the requested attorney ..., or because the defendant has trust and confidence in the requested attorney.... However, these subjective factors should be taken into account by the trial court in exercising its discretion....
"In exercising its discretion, the trial court should take into account not only the foregoing subjective factors, but also objective factors such as previous representation of defendant by the requested attorney in the underlying or in any other proceeding, any extended relationship between defendant and the requested attorney, the familiarity of the requested attorney with the issues and witnesses in the case, the duplication of time and expense to the county of appointing an attorney other than the requested attorney, and the timeliness of the request...." (Alexander v. Superior Court (1994) 22 Cal. App.4th 901, 915-916 [27 Cal. Rptr.2d 732], citations omitted.)
*277 (1b) We conclude, as we did four and a half years ago, prior to the instant retrial, that Superior Court Judge Leon S. Kaplan did not abuse his discretion in not appointing William Genego to represent appellant.
The trial court fully considered the motion to appoint Mr. Genego, conducted a hearing, elicited the qualifications of Mr. Genego and other attorneys, and made findings of fact.
The trial court stated: "I've heard all of the representations made to the court under oath and I am making a finding of fact based on credibility. I disbelieve Mr. Robinson's statements and I believe the statements by Mr. Calabria [defense counsel at his first trial]. I believe at the time Mr. Calabria was fully qualified to represent Mr. Robinson, that he did so with a great degree of thoroughness and with a great degree of preparation and clearly an intensive consultation with the client and assertion by Mr. Robinson to the contrary I believe are lies. So were Mr. Calabria available for appointment, I would follow it as what has been the practice of my court to appoint a person, to reappoint the person who represented the defendant at trial. Mr. Calabria indicates that he is not available, and furthermore that he does not want to do it."
As to Mr. Genego's experience, it was primarily academic and appellate. He had "handled" cases in the District of Columbia but "did not conclude a jury trial on those cases." When asked, "In California, how many felony cases have you taken to jury trial?" he responded, "I've not taken any felony trial juries in the State of California in the state court." When asked how many felony cases he had tried in federal court, he estimated "approximately three cases" and did not claim any of the three were jury trials.
The trial court explained, "[Mr. Genego does not have] trial experience to justify ... appointment in a case as serious as this one.... Mr. Genego while he has some criminal experience, when specifically asked how many murder cases he had handled, he informed the court he never handled a murder case.... I don't think he possesses the necessary experience as a trial attorney to be involved in the representation of a case as serious as this one."
Additionally, we note that Mr. Genego's relationship with appellant had been only as a supervisor of Ms. Weeks, the (then) law school student who directly handled appellant's successful petition for a writ of habeas corpus. Mr. Genego had not represented appellant "in [a] related prosecution[]" (Harris v. Superior Court (1977) 19 Cal.3d 786, 797 [140 Cal. Rptr. 318, 567 P.2d 750]) nor, apparently, had any personal contact with prosecution or defense witnesses.
*278 We find, in not appointing William Genego to represent appellant, the trial court did not abuse its discretion. (Drumgo v. Superior Court (1973) 8 Cal.3d 930 [106 Cal. Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984]; see 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) §§ 2745-2747, pp. 3311-3316.)

2. Appellant contends the trial court erred by refusing to allow Shauna Weeks to act as appellant's advisory counsel.

Appellant states "[t]he court's error [in not appointing Mr. Genego] ... was compounded by the court's erroneous refusal to allow Ms. Weeks to assist appellant as advisory counsel." Appellant is mistaken. There was no "erroneous refusal" because there was no refusal.
To recapitulate. Ms. Weeks, while a law school student, handled appellant's petition for a writ of habeas corpus. Some years later, when the petition was granted, she was an attorney in a large civil law firm. She then filed a motion in superior court to have her former law school supervisor, William Genego, appointed to represent appellant. When the trial court instead appointed John Myers to represent appellant, the court also appointed Ms. Weeks "as associate counsel" to Mr. Myers. Sometime thereafter, when appellant's motion to represent himself was granted, the trial court relieved both appointed attorneys, Mr. Myers and Ms. Weeks. Before doing so, the trial court made sure appellant understood. ("The Court: If you go propria persona, you should understand clearly that that means you want both, all your lawyers to be relieved. [¶] Is that correct? [¶] The defendant: That's correct.")
Appellant did not request an advisory counsel and the trial court did not refuse him one. (4) As we have said, "`When a defendant requests appointment of advisory counsel, a court's failure to exercise its discretion is serious error and its denial of a request ... may constitute an abuse of discretion.'" (People v. Walton (1996) 42 Cal. App.4th 1004, 1017-1018 [49 Cal. Rptr.2d 917], italics added.) Absent such a request, a trial court has no duty "to make a record" explaining why it has not appointed advisory counsel.

3. Appellant contends the trial court erred in telling him if he chose to represent himself he could not reassert his right to counsel.

(5) Appellant's claim is based upon the following remarks by the trial court:
"Mr. Robinson, I am inclined to let you represent yourself if that's what you wish to do. However, to protect your own interest, I'm going to make a *279 suggestion to you. You can either agree to it or not agree to it. And that is that Mr. Myers give you a copy of the transcripts, and you take a look at those and think about whether or not you really want to represent yourself in light of all you'll be getting into.
"Would you like to proceed that way or you want to start representing yourself right now? But I should tell you if you represent yourself and you agree to do that, we're not going to go back the other way. [Italics added.]
"What would you prefer?"
Appellant contends the trial court misled him because had he known he was allowed to change his mind, he would have asked that counsel be reappointed. We are not persuaded.
We view the italicized sentence as no more than an admonition that a request for self-representation is serious, not one to be lightly made or granted, and, as in this case, if granted, one that causes substantial delay. In fact, there was substantial delay. The self-representation motion was granted August 30, 1993, and the retrial did not begin until June 29, 1994.
At no time during these 10 months, nor during the lengthy trial, did appellant refer to the italicized sentence or seek to change his pro se status.
Appellant's contention is similar to the one considered and rejected in People v. Gallego (1990) 52 Cal.3d 115 [276 Cal. Rptr. 679, 802 P.2d 169]. There also, a trial court concerned about the dangers of self-representation and delay advised the defendant "... he would not be able to stop the case in the middle of trial by announcing that he had changed his mind and wanted a lawyer." (Id. at p. 159.)
We find no error.

4. Appellant contends the trial court erred in allowing the prosecutor to question him about statements obtained in violation of Miranda.

To consider appellant's claim it is necessary to augment the factual and legal background.
Some months after the murder, appellant was arrested and questioned. The questioning lasted four and a half hours and was tape-recorded. At the outset, appellant was advised of and waived his Miranda rights. Then, for a time, appellant made exculpatory statements. Later, appellant made a comment about getting a good lawyer and making a phone call. (Robinson v. *280 Borg, supra, 918 F.2d 1387.) Still later, appellant confessed. At his first trial, appellant's confession was admitted into evidence.[2] His conviction was affirmed on appeal. (People v. Gilman, supra, 156 Cal. App.3d 760, 766.)
Six years later, a divided federal court of appeals held appellant had invoked his right to counsel during the four-and-one-half-hour interview and all his statements thereafter, including his confession, were inadmissible. (Robinson v. Borg, supra, 918 F.2d 1387.)
Prior to his retrial, appellant filed a scholarly nine-page motion to preclude use of his statements substantively or for impeachment.
The motion accurately described the law: Harris v. New York (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] permitted statements obtained in violation of Miranda to be used for impeachment; People v. Nudd (1974) 12 Cal.3d 204 [115 Cal. Rptr. 372, 524 P.2d 844] agreed with Harris; People v. Disbrow (1976) 16 Cal.3d 101 [127 Cal. Rptr. 360, 545 P.2d 272] overruled Nudd and held such statements inadmissible for impeachment; in 1982, effective June 9, 1982, the people passed Proposition 8; People v. Smith (1983) 34 Cal.3d 251, 258 [193 Cal. Rptr. 692, 667 P.2d 149] held Proposition 8 applicable only to prosecutions for crimes committed on or after June 9, 1982; People v. May (1988) 44 Cal.3d 309, 311 [243 Cal. Rptr. 369, 748 P.2d 307] held Proposition 8 had abrogated the rule of People v. Disbrow.
Thus, although the trial was to occur in 1994, 12 years after Proposition 8 had abrogated Disbrow, because the crimes had been committed in 1980, the law of 1980, including Disbrow, applied.
Accordingly, the prosecution conceded appellant's motion should be granted and the trial court so ruled.
In his opening statement the prosecutor made no reference to any statement by appellant.
During his case-in-chief the prosecutor called 21 witnesses. None were asked about any statement by appellant. But appellant, during his cross-examination of one of those witnesses, Kim Bricker, did elicit such a reference.
The thrust of appellant's cross-examination was that Ms. Bricker had given three inconsistent statements to the police and her third, most damaging one, was coerced as a result of her being a three-month prisoner in the Van Nuys jail. This is the pertinent colloquy:
*281 "Q: Isn't it true, Miss Bricker, that it was at that time during your forced stay at Van Nuys that your entire story about me and your involvement entirely changed?
"The Witness: My entire story about you? No. I gave  they played me a tape of you confessing."
Appellant objected. There was a sidebar conference at which the court indicated the answer might well be responsive but agreed to strike the answer and admonish the jury to disregard it. The court did both. Appellant sought no further admonition and did not move for a mistrial. Additionally, the court advised appellant "I'm going to remind you again, Mr. Robinson, that if you open up a door on the question and the witness gives you an answer that is technically responsive, you may be stuck with the response that you get."
After this brief incident, the prosecutor called 17 witnesses and, 8 days later, rested. Appellant called three defense witnesses and then he, himself, testified. He began by discussing the events before and during the crime  denying he threw the acid or had any knowledge Savage intended to do so. But he did not stop there. He further testified: "After this incident had taken place, I had contacted the police. I had met with them and told them what had happened. They didn't have a warrant out for me. They didn't have to track me down. They didn't have to hunt me down like I was a mad dog or something.
"And after I told them what I knew what Savage told me on the way back, it was at that time when they made the arrest with all the other people who was involved. It was at that time when I picked up Kim Bricker  I don't think you recall her testimony where she had made a mistake where they played a statement of my confession. It was no confession. I told them what the hell happened, but, unfortunately, I was dealing with the Foothill Police Department. Well, they did what they had to do 
"The Court: Excuse me. Let's approach, please.
"(The following proceedings were held out in the hallway:)
"The Court: Mr. Robinson, you're  my understanding is that your prior conviction was reversed, at least in part, because the jury heard what purports  or what was purported to be a confession by you. You have now put that confession a[t] issue.
"Do you understand what we're talking about here?"
*282 (6) Appellant contends the trial court erred in allowing the prosecutor to question his testimony that he had not confessed to the police but had only "told them what the hell happened."[3] Appellant relied on Disbrow and asserts there are no exceptions to its impeachment bar and there is no "opening the door" doctrine.[4] Appellant is mistaken on all counts.
In Walder v. United States (1954) 347 U.S. 62, 65 [74 S.Ct. 354, 356, 98 L.Ed. 503] Justice Frankfurter addressed this issue, stating:
"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the Weeks doctrine would be a perversion of the Fourth Amendment.
"Take the present situation. Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics. Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility."
Walder has been accepted by California courts. (People v. Taylor (1972) 8 Cal.3d 174, 182-184 [104 Cal. Rptr. 350, 501 P.2d 918]; People v. Disbrow, supra, 16 Cal.3d 101, 108; People v. Davis (1966) 241 Cal. App.2d 51, 54 [50 Cal. Rptr. 215]; see also People v. Stanfill (1986) 184 Cal. App.3d 577, 581 [229 Cal. Rptr. 215] ["A defendant who takes the stand to testify in his own behalf waives the privilege against self-incrimination to the extent of all inquiries which would be proper on cross-examination and is subject to impeachment the same as any other witness."]; People v. Shea (1995) 39 *283 Cal. App.4th 1257, 1267 [46 Cal. Rptr.2d 388] [If "`the defendant first seeks to mislead a jury or minimize the facts ...' he may properly be questioned further."].)
In the words of Walder, appellant "was free to deny all the elements of the case against him" without risk of tainted impeachment. Appellant did more. Because he thought he could do so with impunity, appellant sought to mislead the jury by claiming he had not confessed to the police but instead had "told them what the hell happened."
In such circumstances, the trial court did not err in allowing prosecutor cross-examination.

5. Appellant contends the trial court erred in answering the jury's question about a great bodily injury allegation.

(7) Count III, assault with caustic chemicals, alleged appellant had inflicted great bodily injury upon Patricia Worrell. (§ 12022.7.) The jury asked the trial court if that allegation required appellant to have personally inflicted such injury. The trial court said "no," and the jury found the allegation true.
The trial court erred. (People v. Cole (1982) 31 Cal.3d 568, 579 [183 Cal. Rptr. 350, 645 P.2d 1182].) If the judgment reflected this enhancement error we would order it stricken. It does not. Since the judgment makes no reference to a section 12022.7 enhancement, there is nothing to correct.

DISPOSITION
The judgment is affirmed.
Lillie, P.J., concurred.
JOHNSON, J., Dissenting.
Defendant did not "open the door" to admission of his illegally obtained statements to the police by denying on direct examination he had "confessed" to the crime or by asserting he had told the police what had happened.
In Robinson v. Borg (9th Cir.1990) 918 F.2d 1387 the Ninth Circuit held Robinson's custodial statements to the police were obtained in violation of his Miranda rights and must be suppressed. The issue before us is whether those statements became properly "unsuppressed" because Ricardo H. Robinson mentioned them in his direct testimony at the retrial.
*284 Briefly, this is how this issue arose: In a nonresponsive answer to a question asked on cross-examination, Kim Bricker, a prosecution witness, blurted out: "[The police] played me a tape of you confessing." (Italics added.) Robinson immediately objected. The trial court agreed the answer was nonresponsive, ordered the answer stricken and told the jury to disregard it. Robinson did not move for a mistrial. The court at this point warned Robinson about "opening the door" to things he might not want to come out because he might "be stuck with the response." Later, in his own direct testimony Robinson told the jury Bricker "made a mistake" in saying the police "played a statement of my confession. It was no confession. I told them what the hell happened...." In a sidebar conference with the court and the prosecutor Robinson explained he felt he had to say something about Bricker's allegation he had confessed to the crime because "it was plastered all over the newspapers in the last three days" and he was concerned some of the jurors might have seen the reports. The prosecutor responded Robinson had "opened the door" and therefore he was free to ask Robinson about his statement to the police. The trial court agreed with the prosecutor Robinson's statement to the police could come in because Robinson "brought it up."
In People v. Disbrow (1976) 16 Cal.3d 101, 113 [127 Cal. Rptr. 360, 545 P.2d 272], which the majority concede is controlling here, our Supreme Court held: "... the California Constitution precludes use by the prosecution of any extrajudicial statement by the defendant, whether inculpatory or exculpatory, either as affirmative evidence or for purposes of impeachment, obtained during custodial interrogation in violation of the standards declared in Miranda and its California progeny." (16 Cal.3d at p. 113, italics added.) The court did not add an exception for cases in which the defendant "brought it up." Indeed, if the defendant in Disbrow did not "open the door" to questions about his statements to the police when he gave conflicting testimony at trial (id. at p. 105), it is difficult to imagine how a defendant could ever "open the door" to impeachment based on statements obtained in violation of Miranda.
Furthermore, even under current law which allows a defendant to be impeached with a statement obtained in violation of his Miranda rights such impeachment would not have been proper here. Robinson's testimony was that his statement to the police was not a "confession." The majority contend Robinson sought to mislead the jury by claiming he had not confessed to the police but instead had "told them what the hell happened." But whether Robinson's statement to the police was or was not a "confession" was totally *285 irrelevant to any issue in the trial.[1] The prosecutor's proper response to Robinson's testimony he did not make a confession was to object and move to strike on the ground the testimony was irrelevant. The prosecutor's failure to make the proper response, however, did not "open the door" to evidence of Robinson's statement to the police. There is no such rule of evidence as an "opening-the-door" rule which allows one party to impeach the other on an irrelevant subject. (People v. McDaniel (1943) 59 Cal. App.2d 672, 677 [140 P.2d 88].) As we explained in People v. Williams (1989) 213 Cal. App.3d 1186, 1189, fn. 1 [262 Cal. Rptr. 303], "`Legitimate cross-examination does not extend to matters improperly admitted on direct examination. Failure to object to improper questions on direct examination may not be taken advantage of on cross-examination to elicit immaterial or irrelevant testimony.'" (Quoting from People v. McDaniel, supra, 59 Cal. App.2d at p. 677.)[2]
I conclude, therefore, the trial court erred in allowing the prosecutor to question Robinson about his statement to the police. It necessarily follows the court erred in striking Robinson's testimony when he refused to answer those questions.
The People argue even if it was error to allow the prosecutor to cross-examine Robinson about his statement to the police the error was harmless. The court struck Robinson's entire testimony, including his testimony on cross-examination, and instructed the jury to disregard it. Therefore, the People reason, the jury did not consider Robinson's incriminating statements to the police in its deliberations. I am not persuaded by this argument for two reasons.
I cannot accept the People's assumption the jurors did not consider Robinson's incriminating statements to the police because the trial court told *286 them not to. There are some things a jury just cannot ignore  among these are "the powerfully incriminating extrajudicial statements of a codefendant." (Bruton v. United States (1968) 391 U.S. 123, 135-136 [88 S.Ct. 1620, 1627-1628, 20 L.Ed.2d 476]; accord, People v. Aranda (1965) 63 Cal.2d 518, 525 [47 Cal. Rptr. 353, 407 P.2d 265].) If the jury cannot perform the "mental gymnastic" of disregarding a codefendant's statement implicating the defendant (Aranda, supra, at p. 525) how can they reasonably be expected to disregard the defendant's own incriminating statements? The answer is, they cannot. (Cf. People v. Fletcher (1996) 13 Cal.4th 451, 465 [53 Cal. Rptr.2d 572, 917 P.2d 187] [reaffirming Aranda's holding jurors cannot be expected to obey instruction to disregard codefendant's confession implicating the defendant].) Indeed, one of the reasons the Disbrow court gave for holding a defendant could not be impeached with his statement obtained in violation of Miranda was that "[t]o instruct a jury that they are not to consider expressions of complicity in the charged crime as evidence that the [defendant] in fact committed the charged crime, but only for the purpose of demonstrating that he was probably lying when he denied committing the charged crime, would be to require, in the words of Learned Hand, `a mental gymnastic which is beyond, not only [the jury's] power, but anybody else's.' ..." (People v. Disbrow, supra, 16 Cal.3d at p. 112, citation omitted.)
More importantly, the People's argument ignores the fact that by erroneously striking Robinson's testimony, including his direct testimony, the trial court denied him the constitutional right to testify in his own defense. (Rock v. Arkansas (1987) 483 U.S. 44, 49 [107 S.Ct. 2704, 2707-2708, 97 L.Ed.2d 37]; People v. Robles (1970) 2 Cal.3d 205, 215 [85 Cal. Rptr. 166, 466 P.2d 710].) Such an error, if not reversible per se, requires reversal unless the court can say it was harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; see People v. Cahill (1993) 5 Cal.4th 478, 487, 510 [20 Cal. Rptr.2d 582, 853 P.2d 1037].)
On the record before us, I am unable to say the error in striking Robinson's testimony was harmless beyond a reasonable doubt.
The People's case was strong, but not ironclad. For example, the People's chief witnesses, Bricker and Bobby Ray Savage, were both admitted liars and generally unsavory characters whose testimony the jury might have disbelieved or accorded little weight. Savage, who was serving a life prison term for these same crimes, admitted he committed perjury at his own trial and that he had agreed to testify truthfully this time only after the prosecutor promised to request prison officials to allow him to remain in prison in San *287 Luis Obispo rather than be sent to a less desirable facility. Ms. Bricker's bias against Robinson is plain from her testimony, even on the "cold record" before us. Furthermore, Patricia Worrell could have been mistaken in saying it was the Black male who threw the acid. The incident must have happened in a few seconds and, if Robinson's testimony was credited, both men were in motion at the same time so that Ms. Worrell might not have accurately perceived which one threw the acid.
The fact Robinson returned from the trip to Los Angeles with a "terrible burn on his hand" does not necessarily mean Robinson threw the acid. Savage testified both he and Robinson got some of the acid on their hands and clothes. The roommate who testified Robinson asked him if he would throw acid on someone if he were paid to do it could not remember whether Robinson asked him this question before or after the attack on Ms. Worrell.
Robinson's defense was based on his assertion he was an innocent bystander to Savage's attack on Ms. Worrell. Robinson admitted giving Savage a ride to Los Angeles but claimed Savage told him they were going there for a drug buy. When they arrived at Ms. Worrell's apartment, Robinson thought they were at the home of Savage's drug connection. According to Robinson, when Ms. Worrell answered the door Savage pushed him out of the way and threw the acid.
Evidence was admitted at trial consistent with Robinson's version of events. For example, Savage admitted at the time of the incident he did have a drug connection in Los Angeles and he asked Robinson to give him a ride to Los Angeles to buy cocaine.[3] Savage's former employer testified Savage told him that he and Robinson had "driven to California, knocked on a young lady's door; when she opened the door, Mr. Savage pushed [defendant] out of the way, threw acid in the young lady's face [and] returned to Las Vegas." Another witness, Herbert Brown, testified defendant called him a few days after Ms. Worrell's murder in August 1980 and said "he was there when this crazy white guy threw acid in this woman's face." This conversation took place four months before defendant was questioned by police about the crime.
Although the evidence described above was not stricken it was insufficient to exonerate Robinson from liability for the crimes. Even if the jury believed Savage threw the acid on Ms. Worrell, Robinson could still be convicted as an aider and abettor and the jury was instructed on this theory. Given the state of the evidence, Robinson's acquittal depended on his *288 creating a reasonable doubt in the jurors' minds whether he knew Savage's criminal purpose in going to Ms. Worrell's home and acted with the intent to facilitate it. The only evidence which could have raised such a doubt was Robinson's direct testimony and it was stricken.
For the reasons stated above, Robinson's conviction should be reversed.
Appellant's petition for review by the Supreme Court was denied May 21, 1997.
NOTES
[1] The 1993 decision by Superior Court Judge Michael B. Hawrin (not to appoint Mr. Genego) is not substantively addressed by appellant.
[2] Although appellant was jointly tried with Richard Gilman, there were two juries (People v. Gilman, supra, 156 Cal. App.3d 760, 762), and, presumably, only appellant's jury heard his confession.
[3] Although appellant also contends the trial court erred in striking his testimony after he refused to further answer the prosecutor's questions, that contention is based upon the instant one.
[4] See Mueller and Kirkpatrick, Modern Evidence (1995) section 1.4, pages 15-21 "Waiving Objections  Invited Error, Opening the Door" and section 6.61, pages 900-906, "Effect of Constitutional Restricts"; 1 McCormick on Evidence (4th ed. 1992) section 182, pages 753-761, "Exceptions to Exclusion (d) Use of Illegally Obtained Evidence to Impeach Testifying Defendant."
[1] A confession is a statement encompassing all the elements of a crime which discloses the confesser's guilt and excludes the possibility of a reasonable inference to the contrary (People v. Thompson (1990) 50 Cal.3d 134, 188, fn. 10 [266 Cal. Rptr. 309, 785 P.2d 857]; People v. Beverly (1965) 233 Cal. App.2d 702, 712 [43 Cal. Rptr. 743]) as contrasted to, say, an admission which is a recital of facts tending to establish guilt when considered with the remaining evidence in the case (People v. McClary (1977) 20 Cal.3d 218, 230 [142 Cal. Rptr. 163, 571 P.2d 620]). However, the admissibility of a defendant's statement to the police does not turn on whether the statement is labeled a "confession," an "admission" or something else. Therefore, evidence as to what label should be put on the statement was totally irrelevant. Furthermore, even if evidence defendant's statement was a "confession" was somehow relevant to its admissibility, the admissibility of evidence is a decision for the trial court, not the jury, so there could be no reason for exploring defendant's prejudicial statements to the police in front of the jurors.
[2] It is obvious, of course, the prosecutor's purpose in cross-examining Robinson about his statements to the police was not to prove the statements were a "confession" in the legal sense, but to get the incriminating contents of the statement before the jury by pointing out inconsistencies between those statements and Robinson's testimony at trial. This is precisely what the Disbrow case prohibited. (People v. Disbrow, supra, 16 Cal.3d at pp. 105, 113.)
[3] Savage also testified buying cocaine was not the "sole purpose" of their trip, implying the attack on Ms. Worrell was also a purpose of the trip.